Belynda Faye GOFF *v.* STATE of Arkansas

CR 97-135                                        953 S.W.2d 38

Supreme Court of Arkansas
Opinion delivered September 18, 1997
[Petition for rehearing denied October 23, 1997.]

*Vowell & Atchley, P.A.*, by: *Stevan E. Vowell* and *Hatfield & Lassiter*, by: *Jack T. Lassiter*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Belynda Faye Goff was convicted of first-degree murder of her husband and sentenced to life in prison. She raises four points for reversal.

Ms. Goff first argues the trial court erred in denying her motion for directed verdict because the State failed to prove she purposely caused the death of her husband Stephen. The State's case was premised on circumstantial evidence, but as this court has previously and consistently held, evidence, whether direct or circumstantial, is sufficient to support a conviction if the evidence is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997). In determining the sufficiency of the evidence, we need only ascertain that evidence most favorable to the appellee; it is permissible to consider only that testimony which supports the verdict of guilty. *Hall v. State*, 315 Ark. 385, 868 S.W.2d 453 (1993).

In reviewing the record, it is clear the Goffs had had marital problems for some time prior to as well as at the time of Mr. Goff's death. Ms. Goff related that her husband had been unfaithful to her, and had affairs with at least two women. Anita Bellefeuille, a friend of Ms. Goff, testified that, about one year before Mr. Goff's murder, Ms. Goff said next time her husband was unfaithful she would "bash his head in." In December of 1993, Ms. Goff used an empty apartment in the complex where the Goffs lived so she could spy on Mr. Goff. In fact, at the time Mr. Goff was killed, Ms. Goff suspected he was having another affair because, when the telephone would ring, the caller would hang up when Ms. Goff answered, but when Mr. Goff answered, he would talk with the caller. On the evening of June 11, 1994, only hours before Mr. Goff's murder, he had received a call and left the

apartment. He told Goff that he was going for a pack of cigarettes, even though the store was closed and he had already purchased cigarettes that day.

Ms. Goff testified she went to bed between 10:00 and 10:30 p.m. on June 11 after Mr. Goff left, and claimed she heard no noises except a door shutting some time during the night. However, the Goffs' upstairs neighbor testified that, around 2:00 a.m. on June 12, she had heard three knocks on the Goffs' door and the door open. The neighbor further said that one to two minutes later she heard five or six loud "bangings," as if someone was banging a broomstick on the ceiling. She added that the banging was so loud she was afraid that it would awaken her six-month-old daughter. Dr. Charles Kokes, who performed the autopsy on Mr. Goff, testified that everything regarding the condition of Mr. Goff's body at the time he was found was consistent with a time of death around 2:00 a.m.

Ms. Goff testified that she slept through the night, got up about nine minutes after the alarm went off at 4:30 a.m., and found her husband's body shortly thereafter. However, Jay Thomas, a paramedic for North Arkansas Medical Center, testified that, when he first arrived at the scene, Ms. Goff was fairly calm, and all the lights were off, both of which he found very strange. He also testified Ms. Goff was dressed in nightclothes which consisted of a camisole and tight blue pants, that she did not appear groggy or sleepy, and that her hair was not "messed up," as would be consistent with someone who had just awakened. Mr. Thomas further testified that when he got there he could only open the door about six inches because Mr. Goff's body was lying against the door. Ms. Goff and her son were only able to get out of the apartment after the door was forcibly opened about eight inches. Mark Forsee, who answered the emergency call Ms. Goff made when she allegedly discovered Mr. Goff's body, testified that during the nine-minute conversation he had with Ms. Goff before the ambulance arrived, she told him there was blood everywhere and that it was her husband's; yet, she did not exhibit any concern or fear that the police might need to be there or that anybody else might be in the apartment.

Lt. Archie Rousey, who investigated the murder scene, testified that, when he arrived at the scene, Mr. Goff's body was lying directly behind the door, fully clothed, with his head slightly elevated in the corner against the door where it hinges and a wall that extends at a right angle. He testified that there were massive amounts of blood under Mr. Goff's head. Lt. Rousey stated that there was also a large amount of blood just above his head and the splattering arched upward in a V-shape-type manner up to and on the ceiling. He testified that there was brain matter on the floor in front of Mr. Goff's feet approximately six feet away, a piece of his skull fragment on top of the television set immediately to his right, and another piece of skull fragment approximately twelve feet away from his foot, out into the living room next to the couch. Just above his head approximately eighteen inches there was a scraping on the sheetrock wall which appeared to be in a downward direction toward Mr. Goff's head. There was another scrape on the wooden door trim just above and to the left of his head.

Except for the area surrounding Mr. Goff's body, everything in the apartment seemed to be intact, and there were no signs of a struggle or a forced entry. Further investigation led police officers to find traces of blood in the Goffs' bathtub drain. That blood was tested and was determined consistent with Mr. Goff's DNA profile. In addition, the bathtub, shower curtain, and toilet plunger were wet. A pile of fourteen towels and one washcloth were found in the master bedroom under another pile of dry dirty clothes and next to a clothes basket that was almost empty. Four of the towels and the washcloth were extremely wet and the rest of the towels were damp. One of the towels had blood on it.

Dr. Kokes testified that Mr. Goff died as a result of blunt-force injuries to the head. He stated that Mr. Goff had various injuries to the back and top of his head and that in his opinion, the injuries to the back of the head occurred first, followed by the injuries to the top of the head. Kokes opined that, after being hit in the back of the head, Mr. Goff would have collapsed. He further testified that the injuries to the top of Mr. Goff's head indicated that Mr. Goff had been hit repeatedly at least six times, after he had been rendered incapacitated. Mr. Goff also had injuries on his right hand, which Dr.Kokes testified appeared to be sustained

in a defensive manner, such as an attempt to ward off blows. He also testified that the injuries to Mr. Goff's head were caused by an object, such as a hammer, having a curved to oval shape measuring approximately five-eights to three-quarters of an inch in diameter. Two hammers were found in a box in the Goffs' kitchen. Tom Bevel, a forensic consultant who assisted in the investigation, testified that the attacker was right-handed. The proof showed that Ms. Goff is right-handed.

Ms. Goff reported Mr. Goff's death to his life insurance company and told the company that her husband had "appeared to have been severely beaten somewhere in Carroll County and returned to home and left in doorway." However, the evidence clearly reveals that Mr. Goff had been murdered in his own apartment. First, there was blood on the inside of the door, not on the outside. Second, Mr. Bevel testified that, given the pattern of blood on the wall, Mr. Goff received the majority of the blows to his head in the corner in which his body was found, with the attacker either straddling him or standing to his side. It was also Dr. Koke's opinion that Mr. Goff was lying in the corner where his body was found when he was hit on the top of the head. The scrapes on the wall also indicated that Mr. Goff was attacked while lying in that corner.

In summary, we first point out that this court has often stated that a defendant's false and improbable statements explaining suspicious circumstances are admissible as proof of guilt. *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993); *Bennett v. State*, 297 Ark. 115, 754 S.W.2d 799 (1988). Such improbable statements were made by Ms. Goff in this case. Contrary to Ms. Goff's version of occurring events, the evidence clearly indicates that her husband had been beaten to death while present in the couple's apartment, and given the position of Mr. Goff's body, the undisturbed blood stains on the inside doorknob, and the undisturbed windows, Mr. Goff's attacker did not leave the apartment. Further, the hammers found in the kitchen are consistent with the type of weapon that would inflict the wounds that caused Mr. Goff's death. Mr. Goff's blood was found on the bathtub drain, and a large pile of wet towels — one with blood on it — was found in the master bedroom. Such evidence indicates

that someone in the apartment had attempted to "clean up" the crime scene. Ms. Goff and her three-year-old son were the only people in the apartment when Mr. Goff's body was found. In addition, although Ms. Goff claims to have gotten up about nine minutes after the alarm went off at 4:30 a.m., her emergency call was actually made at 4:18 or 4:19 a.m., before she claims she actually woke up. When the paramedics arrived at the scene, Ms. Goff initially appeared calm and was not disheveled or groggy as if she had just woken up. Finally, the timing of Mr. Goff's death and their marital difficulties provides an opportunity and a motive for Ms. Goff to kill her husband. We conclude the evidence was more than sufficient to establish that Ms. Goff murdered her husband. Thus, the trial court properly denied Ms. Goff's motion for a directed verdict.

■ ■ Ms. Goff's second point concerns the trial court's ruling permitting Dr. Marcia Eisenberg to testify concerning DNA profiling evidence of the blood found in the Goffs' bathroom. Ms. Goff argues that the testimony had been performed by technicians under the supervision and control of Richard A. Guerrieri, who had prepared the DNA report. She argues that it was objectionable hearsay to allow Eisenberg to testify concerning the test results and opinions in Guerrieri's report. In brief, Dr. Eisenberg, using Guerrieri's report, opined at trial that the blood from the bathtub drain was consistent with the known sample from the victim and inconsistent with the known sample from Ms. Goff and her children.

Ms. Goff relies on *Llewellyn v. State*, 4 Ark. App. 326, 630 S.W.2d 555 (1982), where the court of appeals held that, under Rule 803(8) of the Uniform Rules of Evidence, a drug-laboratory supervisor's testimony was inadmissible because he was not present when the substance was delivered to the lab, and he had no personal knowledge of the receipt or testing of the substance.[1] The

---

[1] Rule 803(8) in pertinent part provides:
... The following are not within this exception to the hearsay rule: (i) investigative reports by police and other law enforcement personnel; (ii) investigative reports prepared by or for a government, a public office, or an agency when offered by it in a case in which it is a party; (iii) factual findings offered by the government in criminal cases; (iv) *factual findings resulting from special investigation of a particular*

facts and legal argument in *Llewellyn* differ from those presented here. First, factually, Dr. Eisenberg testified that not only did she supervise Guerrieri, she also independently reviewed his test results. She related that under standard operating protocol, all testing is done under her supervision and she must approve all results and conclusions that are reached. Also, as pointed out by the State, under Ark. R. Evid. 703 (not discussed in *Llewellyn*), and pertinent case law, an expert can render an opinion based on facts and data otherwise inadmissible, including hearsay, as long as they are of a type reasonably relied upon by experts in the field. Eisenberg was qualified without objection as an expert in the field of DNA testing, and she testified that it was "quite common" for DNA experts to examine case files and protocols and decide whether the DNA testing in a particular case is accurate. She said that she did so in this case. *Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996). In addition, when an expert's testimony is based on hearsay, this court has held that the lack of personal knowledge on the part of the expert does not mandate the exclusion of the testimony, but instead it presents a jury question as to the weight of the testimony. *See Id.*; *Scott v. State*, 318 Ark. 747, 888 S.W.2d 628 (1994). Because this court does not reverse the trial judge's ruling on a hearsay question absent an abuse of discretion, we find no such abuse here and affirm on this point. *Ferrell*, 325 Ark. at 462.

■ Next, relying on *Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986), Ms. Goff submits the trial court erred by admitting into evidence six autopsy photographs she claims were intended to inflame the jury. This court has often stated that the admission and relevancy of photographs is a matter within the sound discretion of the trial court, and the mere fact that photos are inflammatory will not render them inadmissible. *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). Even the most gruesome photos may be admissible if they tend to shed some light on any issue, to corroborate testimony, or if they are essential in proving a necessary element of a case, are useful to enable a witness to

*complaint, case, or incident*; and (v) any matter as to which the sources of information or other circumstances indicate a lack of trustworthiness. (Emphasis in original.)

testify more effectively, or enable the jury to better understand testimony. *Jones v. State*, 329 Ark. 62, 947 S.W.2d 339 (1997). Other acceptable purposes are to show the condition of the victims' bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. *Id.*

Here, the disputed photos revealed the position of Mr. Goff's body when found, and aided in the explanation he had been attacked while inside the apartment. They further served as aids to Dr. Kokes when explaining to the jury the nature and extent of the victim's injuries. The photographs, too, supported Kokes's opinion that the weapon used in Mr. Goff's murder had a circular or oval hard surface like the hammer found in the Goffs' apartment. Finally, the challenged photographs, in depicting the nature and extent of Mr. Goff's wounds, helped the prosecution prove Ms. Goff had acted purposefully — a required element in proving first-degree murder, the crime with which she was charged. *See* Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1993). Because the six photographs were shown to have enabled Kokes to testify more effectively and to enable the jury to understand just how and where Mr. Goff was killed, the trial court did not abuse its discretion in allowing them into evidence.

Ms. Goff's final argument requests her sentence be reversed and remanded for a new sentencing because the trial judge improperly entered the jury room and communicated with the jurors during their deliberations. We agree.

While the jury was deliberating on Ms. Goff's sentence, the jury sent the judge a message raising the following three questions: (1) Whether the jury had to impose a fine and whether that fine could be zero; (2) What would happen if it could not agree on a sentence; (3) Whether insurance money was always considered pecuniary gain. The judge proposed answering each question as follows: (1) No; (2) He expected the jury to come to a verdict; (3) The question of whether insurance money was pecuniary gain was for the jury to decide. The judge then suggested he could bring the jury into the courtroom to answer their questions or he could go into the jury room to answer them — whichever the attorneys wanted. The prosecutor and defense counsel said, "That will be

satisfactory with us, Judge." The record reflects the judge went into the jury room, remained there for eight minutes, then returned. No record apparently was made of the judge's appearance in the jury room, nor does the record reflect he disclosed to the attorneys what had been discussed with the jurors. Two minutes after the judge returned from the jury room, the jury returned with a sentence of life imprisonment.

■ For reversal, Ms. Goff relies on Ark. Code Ann. § 16-89-125(e) (1987), which provides as follows:

> (e) After the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence, or if they desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the counsel of the parties.

Ms. Goff contends that the language in § 16-89-125(e) mandates that a jury which is in deliberation must be brought into open court before any information may be given to it, that noncompliance with this statutory provision gives rise to a presumption of prejudice, and the State has the burden of overcoming that presumption. This court has held as much in prior cases. *See Clayton v. State*, 321 Ark. 602, 906 S.W.2d 290 (1995); *Davlin v. State*, 313 Ark. 218, 853 S.W.2d 882 (1993); *Tarry v. State*, 289 Ark. 193, 710 S.W.2d 202 (1986). In *Tarry*, the court held the State had not met its burden and held that the trial court's violation of § 16-89-125(e), by answering questions of law in the jury room, must be deemed prejudicial. However, in *Martin v. State*, 254 Ark. 1065, 497 S.W.2d 268 (1973), this court held that strict compliance had been waived where the attorneys went with the judge to the jury room, everything that happened was reported in the record, and there was no possibility of prejudice. In the present case, like in *Tarry* and *Davlin*, the State did not meet its burden of showing what occurred during the judge's visit to the jury room, so the trial judge's violation of § 16-89-125(e) must be deemed prejudicial to Ms. Goff.

■ The State argues that cases such as *Tarry* and *Davlin* should be overruled to the extent that they do not require an

objection or a showing of prejudice in order for an appellant to raise and prevail on a § 16-89-125(e) argument on appeal. The State correctly contends that the general rule in Arkansas, with few exceptions, is that a contemporaneous objection must be made in the trial court in order to raise an argument on appeal. *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). The State asserts that an objection would have brought the violation to the judge's attention, and he could have easily remedied that violation by instructing the jury in open court. In a twofold argument, the State also cites *Berna v. State*, 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied*, 470 U.S. 1085 (1985), where this court held that prejudicial error would no longer be presumed and that, in order to prevail, appellants must show prejudice, which Ms. Goff failed to do here.[2]

The State first expounds, citing *Jefferson v. State*, 328 Ark. 23, 941 S.W.2d 404 (1997), that even a statutory mandate requires a litigant to object at trial in order to raise claims on appeal about the trial court's failure to comply with them. However, *Jefferson* involved Ark. Code Ann. § 16-89-118 (1987), which requires the trial court to instruct, under oath, the officer (bailiff), taking the jury for viewing, to keep the jurors from communicating with others about the case. There, this court, citing *Berna*, concluded that, although the trial judge did not fully comply with § 16-89-118, his error did not affect the basic fairness of the trial, thus the *Jefferson* court rejected the defendant's argument that the trial judge's error required reversal.

The *Jefferson* court further explained that, while a trial court's failure to give an officer the special oath under § 16-89-118 might result in some misconduct or prejudicial error, such error does not encompass the type of fundamental or structural right this court

---

[2] The court of appeals rejected this *Berna* argument in *Huckabee v. State*, 30 Ark. App. 82, 785 S.W.2d 223 (1990). In *Huckabee*, after the jury began its deliberations, the trial judge gave an unrecorded answer to a juror regarding an evidentiary question. The *Huckabee* court held that, although the supreme court's ruling in *Tarry* was not consistent with the line of cases beginning with *Berna*, which require that the appellant demonstrate prejudice, it is clear that the Arkansas Supreme Court has chosen to apply the earlier rule which presumes prejudice with respect to error resulting from noncompliance with § 16-89-125(e).

sought to protect and ensure in *Grinning v. City of Pine Bluff*, 322 Ark. 45, 907 S.W.2d 690 (1995), and *Winkle v. State*, 310 Ark. 713, 841 S.W.2d 589 (1992). For example, in *Grinning*, the court stated that the denial of the right to trial by jury in a criminal case, without the requisite waiver in accordance with the law, is a serious error for which the trial court should intervene, and is therefore an exception to the contemporaneous-objection rule. *See Wicks*, 270 Ark. 781, 606 S.W.2d 266.

We conclude such a fundamental right is present here, since the trial court's failure to comply with § 16-89-125(e) resulted in both Ms. Goff and her counsel being absent when a substantial step was taken in Ms. Goff's case. *See Kentucky v. Stincer*, 482 U.S. 730 (1987) (Court stated that a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to the outcome if his presence would contribute to the fairness of the procedure); *see also Davlin*, 313 Ark. 218, 853 S.W.2d 882 (1992) (court, in discussing noncompliance by trial judge of § 16-89-125(e), stated that it is a basic principle of both our state's and our nation's criminal procedure that a defendant has the right to be present in person and by counsel when a substantial step is taken in his case). Thus, we hold the trial court's error in failing to comply with § 16-89-125(e) deprived Ms. Goff of a fundamental right which required protection, and as such, is an exception to the contemporaneous-objection rule. Moreover, because the State failed to rebut the presumption of prejudice required by case law where a trial judge fails to comply with § 16-89-125(e), we must reverse and remand this cause for resentencing.

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record has been examined in its entirety and no other rulings adverse to Ms. Goff involving prejudicial error were found.