Benjamin S. McFARLAND *v.* STATE of Arkansas

CR 98-404 989 S.W.2d 899

Supreme Court of Arkansas
Opinion delivered May 6, 1999

*Christopher Carter*, Marion County Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *C. Joseph Cordi, Jr.*, Ass't Att'y Gen., for appellee.

Robert L. Brown, Justice. The appellant, Benjamin McFarland, was convicted of capital murder and kidnapping and sentenced to life imprisonment without parole and life imprisonment, respectively. In the summer of 1996, McFarland (age 17) was part of a group of friends who stayed together at a house at 1123 North Spring Street in Harrison. The residence was rented by Robert Diemert (age 27), who had lost his job and allowed Jason McGehee (age 21), the leader of the group, to take

over the premises. The members of the group, who were in their teens and early twenties, lived by cashing stolen and forged checks. They included McFarland, McGehee, Christopher Epps (age 19), Candace Campbell (age 17), Anthony Page, and John Melbourne, Jr. (age 15).

On August 19, 1996, McGehee sent Melbourne into Harrison to cash a stolen check. Melbourne went to Cooper Shoes, which is on the square, and was told that the check was not correctly filled out. Melbourne returned later that day with Anthony Page and was able to cash the check and purchase a pair of shoes. The manager of the store was suspicious of the two and called the bank. When he discovered the check was stolen, he called the Harrison Police Department. While the police officers were at the store, they saw Melbourne across the street and stopped him for questioning. Melbourne told the officers about the stolen checks and other stolen property that could be found at or near the house on North Spring Street. He was released into his father's custody.

The police officers went to the residence. McGehee, Campbell, Epps, and McFarland saw them and hid in the back of the house. They were able, however, to observe the officers as they searched and found the stolen property and concluded that Melbourne, who had not returned, must have "snitched" to the police officers. Later that day, McFarland and Epps saw Melbourne in town and asked him to stop by the house. He did and was immediately set upon by McGehee and Epps. He was beaten by the group, including McFarland, for the next one and one-half to two hours. Later that evening, McGehee decided they all should go to Utah, where he had some relatives — presumably in order to avoid arrest for the stolen and forged checks. Melbourne's hands were bound, and he, along with Epps, McFarland, McGehee, Campbell, and Diemert, left for Utah in Diemert's car.

Campbell and Diemert testified at McFarland's trial that during the trip someone asked Melbourne how it felt to know he was going to die. Campbell testified that it was either Epps or McFarland, while Diemert testified it was McGehee. The group traveled to an abandoned house in Omaha, Arkansas. They entered the

house and again began to beat Melbourne. The testimony established that everyone there participated in the beating at varying levels. At one point, Melbourne tried to escape but only made it to the kitchen before he was caught by McGehee, Epps, and McFarland. There was testimony that McGehee hit Melbourne's head with a box fan and that others hit him with sticks and burned him with a candle wick. This beating lasted approximately an hour. After the beating, McGehee, Epps, and McFarland took Melbourne out behind the house and walked down a trail into a wooded area. Campbell and Diemert stayed in Diemert's car.

Epps, McFarland, and McGehee took turns strangling Melbourne until he died. In a statement made to Arkansas authorities, McFarland admitted that he was the one strangling Melbourne with an orange cord when he expired. The group then drove to Utah. On the way, they left Epps in Tulsa because he was "whining," according to McFarland. When they arrived in Utah, they burglarized McGehee's aunt's house in Elmo, taking a checkbook and her automobile. Diemert left the group while they were burglarizing the house and returned to Arkansas in his car. On August 27, 1996, the remaining three, McGehee, Campbell, and McFarland, were arrested in Provo, Utah. They had used a stolen check to pay for a hotel room and were driving the stolen vehicle. McGehee was placed in an adult facility, and Campbell and McFarland were taken to a juvenile detention facility.

On August 30, 1996, Candace Campbell talked with her mother and told her about Melbourne's murder. Later that day, Campbell called the Harrison Police Department and told the police officers where to find the body and the circumstances surrounding the death. On the evening of September 3, 1996, the police officers found the body approximately 150 yards behind the abandoned house in Omaha. On September 5, 1996, Arkansas law enforcement officers, including Detective Marc Arnold of the Harrison Police Department, flew to Provo, Utah, to interview Campbell and McFarland. After speaking with Campbell, they interviewed McFarland at 1:30 p.m. They initially read him his *Miranda* rights, and McFarland executed a standard waiver form. He further said that he understood his *Miranda* rights. When the police officers began questioning him about the Melbourne case,

McFarland asked if he could speak with an attorney. The police officers ceased their questioning but asked him if he had contacted his family and who his attorney was. McFarland answered that he had spoken with his family but that he did not have an attorney.

Later that same day, at approximately 4 p.m., one of the jailer staff contacted Detective Marc Arnold and told him that McFarland wanted to speak with him again. Detective Arnold, accompanied by an officer with the Provo Police Department, first verified that McFarland wanted to initiate the interview. He read him his *Miranda* rights a second time, and McFarland again executed a waiver form. Detective Arnold testified that McFarland told him that he had spoken with his mother, who urged him to tell the truth. In response to McFarland's inquiry, the detective told him he was probably looking at a capital murder charge. McFarland admitted to beating Melbourne because he had "snitched" and said that he was strangling Melbourne when he died:

> So three of us went out there and next thing I knew was just everybody was getting enraged. . . . Then we went out there and just I don't know the mentality switched for all three of us. One thing led to another and he was strangled. . . . Who actually did it? Well all three of us strangled him at separate times. Are you saying when he finally lost his life, who was strangling him? Me.

McFarland was charged with capital murder and kidnapping and extradited to Arkansas. Before trial, McFarland's counsel moved to suppress the statement, arguing that McFarland was held for six days in Utah before being brought before a judge (he argues nine days on appeal) and that but for the delay, McFarland might have been afforded counsel before being interviewed by the Arkansas authorities. McFarland was found guilty on both counts and sentenced to life without parole for the capital murder charge and life in prison for kidnapping.

## I. Sufficiency of the Evidence

McFarland's first argument is that the trial court erred in refusing to direct a verdict in his favor on both the capital murder and kidnapping charges due to the absence of substantial evidence.

He contends that a directed verdict was proper for the capital murder count because the State failed to prove that he acted with a premeditated and deliberate purpose in the murder. He also claims that with regard to the kidnapping charge, the State did not prove that Melbourne was restrained involuntarily.

■ ■ Motions for directed verdict are treated as challenges to the sufficiency of the evidence. *See Russey v. State*, 336 Ark. 401, 985 S.W.2d 316 (1999); *Johnson v. State*, 326 Ark. 3, 929 S.W.2d 707 (1996). When reviewing the sufficiency of the evidence on appeal, this court does not reweigh the evidence but determines instead whether the evidence supporting the verdict is substantial. *See Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). Substantial evidence is defined as direct or circumstantial evidence that is forceful enough to compel a conclusion and goes beyond mere speculation or conjecture. *See Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998). In determining whether there is substantial evidence, this court reviews the evidence in the light most favorable to the State. *See Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992). Only evidence supporting the verdict is considered. *See Moore v. State*, 315 Ark. 131, 864 S.W.2d 863 (1993).

A person commits capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person" he causes the death of any person. *See* Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997). McFarland urges that the State failed to show that he acted with a premeditated and deliberate purpose and, thus, a directed verdict in his favor was proper. He emphasizes that Jason McGehee led the group and decided what would be done.

■ Because intent can rarely be proved by direct evidence, a jury may infer premeditation and deliberation from circumstantial evidence such as the type and character of the weapon used, the manner in which the weapon was used, the nature, extent, and location of the wounds inflicted, and the conduct of the accused. *See Lever v. State*, 333 Ark. 377, 971 S.W.2d 762 (1998); *Lloyd v. State*, 332 Ark. 1, 962 S.W.2d 365 (1998). The necessary premeditation and deliberation is not required to exist for a particular

length of time and may be formed in an instant. *See Lever v. State, supra*; *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996).

▮ Contrary to McFarland's assertion, there is sufficient evidence of McFarland's premeditation and deliberation. On the way to Omaha, the question was asked Melbourne, either by McFarland or in McFarland's presence: How does it feel to know you're going to die? His death was the culmination of two prolonged beatings and torture. McGehee, Epps, and McFarland led Melbourne out to the back of the house in Omaha and were there for forty-five minutes, taking turns strangling him. An orange cord was used by McFarland to finally kill Melbourne. One can infer premeditation from the method of death itself — strangulation. *See, e.g., Mulkey v. State*, 330 Ark. 113, 952 S.W.2d 149 (1997) (jury could infer the defendant's purpose in causing the victim's death from the blunt-force injuries to the head and evidence of strangulation). Additionally, McFarland was asked when giving his statement: "When you took him out there did you think you might wind up killing him?" He answered: "The thought had crossed my mind a couple of times that that's what might happen." He also stated that the first time he thought about it was on the way to Omaha. McFarland said that the three participants had become enraged and that he was angry because Melbourne had implicated him in a crime he had not committed. Robert Diemert testified that the three young men came back from the woods laughing. In sum, there is substantial evidence of Melbourne's premeditated and deliberate intent to commit capital murder.

Regarding the kidnapping, Melbourne contends that the State failed to prove that Melbourne was transported or restrained without his consent. Kidnapping requires the restraint of another:

> (a) A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty with the purpose of:
>
> . . . .
>
> (4) Inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him; or
>
> (5) Terrorizing him or another person.

Ark. Code Ann. § 5-11-102 (Repl. 1997).

■ ■ This court has held that this statute speaks in terms of restraint and not removal. *See Lee v. State*, 326 Ark. 529, 932 S.W.2d 756 (1996). Hence, the statute reaches a greater variety of conduct because restraint can be accomplished without removal. *See Smith v. State*, 318 Ark. 142, 883 S.W.2d 837 (1994). Here, there are several different acts that constitute kidnapping — forcing Melbourne to stay in the North Spring Street house during the beating in Harrison, removing him to Omaha with hands tied, and preventing him from leaving the house in Omaha. It is true that Melbourne did come to the house on North Spring Street voluntarily, but the evidence established that his hands were bound at the house in Harrison, during the trip to Omaha, and in the house at Omaha.

■ McFarland relies on the fact that Diemert testified that he thought Melbourne came on the Utah trip voluntarily. Diemert, however, did not realize that his hands were bound until the group got out of the car in Omaha. Regardless of that testimony, Diemert did acknowledge that Melbourne was restrained, and we view the evidence in favor of the State. The trial court did not err in refusing to direct a verdict on either charge.

## II. Lesser Included Offense

At trial, McFarland asked the trial court to instruct the jury on first-degree felony murder, based on AMCI 1502, as follows:

> To sustain this charge the State must prove the following things beyond a reasonable doubt:
>
> First: That Ben McFarland, acting alone or with one or more other persons, committed kidnapping, and
>
> Second: That in the course of and in furtherance of that crime, Ben McFarland or a person acting with him, caused the death of John Melbourne, Jr. under circumstances manifesting extreme indifference to the value of human life.

The trial court declined to give the instruction, and McFarland asserts that this was error.

■ ■ McFarland is correct that when evidence at trial warrants instructions on lesser included offenses, the instructions must be given. *See Bradford v. State*, 325 Ark. 278, 927 S.W.2d 329 (1996); *Westbrook v. State*, 265 Ark. 736, 580 S.W.2d 702 (1979). Nevertheless, in this case McFarland was charged with capital murder based on premeditation and deliberation and not capital felony murder. Purposeful first-degree murder under § 5-10-102(a)(2) is a lesser-included offense of premeditated capital murder. *See Allen v. State*, 310 Ark. 384, 838 S.W.2d 346 (1992). First-degree felony murder is not. *See id.* McFarland did not request an instruction on purposeful first-degree murder. As we said in *Allen v. State*:

> Under the capital murder statute, Ark. Code Ann. 5-10-101 (Supp. 1991), there are two types of capital murder. One is the premeditated and deliberate killing of a person, and the other is the killing of a person in the course of one of several enumerated felonies. Appellant was charged only with premeditated and deliberate capital murder. This kind of premeditated capital murder charge includes the lesser charge of purposeful first degree murder. Appellant was not charged with the other kind of capital murder, often termed felony-murder.

310 Ark. at 385, 838 S.W.2d at 346. Stated simply, first-degree felony murder is not a lesser included offense of premeditated and deliberate capital murder.

■ Moreover, the Arkansas Constitution reserves the duty of charging an accused to the prosecutor or the grand jury. *See* Ark. Const. amend. 21 § 1. McFarland was not charged with capital felony murder or first-degree felony murder. The Arkansas Constitution would be violated if the trial court, in effect, amended a criminal information by instructing the jury on an uncharged offense. *See Renfro v. State*, 331 Ark. 253, 962 S.W.2d 745 (1998). There was no abuse of discretion by the trial court in refusing to instruct the jury on first-degree felony murder.

### III. Failure to Suppress the Statement

The facts leading up to McFarland's statement are these. On August 27, 1996, he was taken into custody in Utah, solely on Utah charges — hot checks, burglary, and theft of a vehicle. On August 30, 1996, Arkansas authorities got a phone tip from Candace Campbell, who was in the juvenile facility in Utah, that McFarland and others were involved in Melbourne's murder. On September 3, 1996, they confirmed the murder when they found Melbourne's body in Omaha. On September 5, 1996, the Arkansas law enforcement officers flew to Utah and interviewed McFarland. As soon as he asked for an attorney, they stopped questioning him. A few hours later, McFarland initiated the questioning himself, asking if he could speak with Detective Arnold. At both interviews, he signed a valid rights form. Both interviews were recorded, and there is no evidence that his statements were anything but voluntary. The tape of the second interview was read to the jury at trial and contained his confession of the crime.

McFarland argues now, as he did before the trial court, that his statement should be suppressed because he was not promptly taken before a judge in Utah. He argues that at the time he was questioned, he had been confined in the juvenile facility in Utah for nine days without being brought before a judge and that because of this delay, he did not have counsel. Had he had appointed counsel, he contends that he would not have confessed to the Arkansas police officers.

In denying his suppression motion, the trial court observed that McFarland was sufficiently advised of his rights, made a knowing waiver of those rights, and initiated the second interview with police officers. Furthermore, the trial court emphasized that there was nothing in the record to show when McFarland was brought before a judge on the Utah charges and what actions transpired. Without a sufficient record on this point, the trial court stated that it could make no decision regarding it.

██ ██ We agree with the trial court. When an accused is in custody, any statement made is presumed involuntary, and

the burden is on the State to prove by a preponderance of the evidence (1) voluntariness, and (2) that the statement was knowingly and intelligently made. *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). McFarland cites his age, tenth-grade education, lack of family in Utah, and emotional mental state as factors militating against a knowing waiver of *Miranda* rights and a voluntary statement. In such cases, we look to the totality of the circumstances. *See Clay v. State*, 318 Ark. 122, 883 S.W.2d 822 (1994). In the instant case, we are convinced that McFarland, who was *Mirandized* twice, fully understood his rights and knowingly waived them. Indeed, at one point he exercised his right to counsel. We conclude that the State met its burden. Furthermore, after asking for counsel in the first interview, McFarland initiated contact with the police officers, which led to his confession. Under these circumstances, the United States Supreme Court as well as this court have held that the confession is voluntary. *See Michigan v. Jackson*, 475 U.S. 625 (1986); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995).

 It is the appellant's burden to produce a record exhibiting prejudicial error. *See McGhee v. State*, 330 Ark. 38, 954 S.W.2d 206 (1997); *Edwards v. State*, 321 Ark. 610, 906 S.W.2d 310 (1995). And we will not consider an argument where the appellant presents no citation to authority, makes no convincing argument in support of his allegation of error, and it is not apparent without further research that the argument is well-taken. *See Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998); *Williams v. State*, 325 Ark. 432, 930 S.W.2d 297 (1996). In this case, McFarland failed to put forth any evidence that his constitutional rights were violated in Utah. Indeed, Campbell testified that she and McFarland were both taken before a judge in Utah a couple of days after their arrest. It would have been a simple matter for defense counsel to obtain some kind of official record of his appearance, or lack thereof, before a judicial officer. Moreover, the United States Supreme Court has made it clear that it is only when there is a working arrangement or collaboration between two separate jurisdictions, whether federal and state or state and

sister state, to perpetuate abuses such as delay in the appointment of counsel which led to a confession that suppression may be appropriate. *See Anderson v. United States*, 318 U.S. 350 (1943); *United States v. Rose*, 526 F.2d 745 (8th Cir. 1975), *cert. denied*, 425 U.S. 905 (1976).

The case of *Branscomb v. State*, 299 Ark. 482, 774 S.W.2d 426 (1989) is instructive on this point. In *Branscomb*, a defendant claimed there was unnecessary delay in taking him before a magistrate in Chicago, Illinois, which had an impact on his subsequent confession in Lee County. Branscomb was arrested there on September 27, 1986, and remained incarcerated until December 11, 1986, when a Lee County deputy sheriff brought him back to Arkansas. Except for the defendant's own testimony, the trial court had no information about what happened in Chicago between those dates. The trial court refused to consider the delay after his arrest in Chicago and his transportation to Arkansas, noting that it had no idea what caused the delay in Chicago. In reviewing the decision, we concluded: "We can hardly attribute it [the delay] to an attempt by the state to gain a tactical advantage over Larry (the defendant)." Similarly, in the instant case, we have no idea what happened in Utah between the time McFarland was arrested and when he was interviewed by Arkansas police officers.

Without the facts of what occurred in Utah and evidence that Arkansas authorities somehow prolonged McFarland's ability to have counsel appointed for him, we will not suppress a statement. None of that has been provided us in this case, and we affirm the trial court's decision not to suppress.

### IV. International Covenant on Human and Civil Rights

McFarland also raises the novel defense that the United States has signed the International Covenant on Civil and Political Rights, which provides that the death penalty shall not be imposed on persons below age eighteen years. This argument is meritless. First, the treaty signed by the president provides that persons under age eighteen *may* be sentenced to death. But even more to

the point, the issue is moot. McFarland did not receive the death penalty.

An issue becomes moot if the judgment will have no practical effect on the litigant, and, therefore, the decision on the issue is advisory only. *See Stilley v. McBride*, 332 Ark. 306, 965 S.W.2d 125 (1998). Questions related to the imposition of the death penalty become moot when the death penalty is not imposed. *See Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996); *Brewer v. State*, 271 Ark. 254, 608 S.W.2d 363 (1980). Hence, we give this argument no credence.

## V. Doyle *Violation*

McFarland's final argument is that the trial court erred in refusing to grant a mistrial when Captain Kyle Wolfe, an investigator with the Boone County Sheriff's office, testified that McFarland asked for counsel during his interrogation. He argues that this violated his due process rights because the State used his post-arrest silence for impeachment purposes. *See Doyle v. Ohio*, 426 U.S. 610 (1976). During direct examination, this colloquy ensued:

> PROSECUTOR: And did you ask him if he knew — basically, if he knew what had happened to John Melbourne or anything about him in recent days?
>
> WOLFE: Yes. And he said something to the effect that he had left that morning and that's the last he had seen of him.
>
> PROSECUTOR: He didn't acknowledge in that, then, any knowledge of John Melbourne or anything that had happened to John?
>
> WOLFE: No, sir, he did not.
>
> PROSECUTOR: Essentially, that was a very short interview at that point. Is that correct?
>
> WOLFE: Yes, it was.
>
> PROSECUTOR: And you all concluded that interview?

WOLFE: Yes, sir. I advised him that I didn't believe him, and he said that he wanted to see his attorney, so I just —

PROSECUTOR: Okay. And you stopped the interview at that point?

WOLFE: I stopped.

McFarland's counsel moved for a mistrial because of the reference to the request for counsel, and the trial court denied the motion. On cross-examination, the appellant's counsel tried to establish that McFarland had been truthful in his statement. On redirect, the prosecutor asked:

PROSECUTOR: At that point in the discussion, you felt he wasn't being truthful?

WOLFE: That's correct.

PROSECUTOR: And that's when you told him you didn't think he was being truthful with you, and that's when the conversation ended.

WOLFE: That's correct. He asked for an attorney and I told him it was his prerogative.

PROSECUTOR: And that ended the conversation.

WOLFE: That's correct.

McFarland's counsel renewed his mistrial motion concerning the reference to the attorney, which was again denied. No request for a curative instruction or admonition was made by defense counsel.

The State maintains in this appeal that the prosecutor had no intention of impeaching McFarland with his silence but instead wanted to establish his truthfulness because it had McFarland's confession. Furthermore, the State contends that it did not solicit the testimony from Captain Wolfe. In *Tarkington v. State*, 313 Ark. 399, 855 S.W.2d 306 (1993), we held that there was no *Doyle* violation when there was no comment or question by the prosecutor about appellant's post-arrest silence but instead there was an inadvertent reference to the defendant's silence by a witness. *See*

*also McIntosh v. State*, 296 Ark. 167, 753 S.W.2d 273 (1988), *cert. denied*, 489 U.S. 1065 (1989). In both *Tarkington* and *McIntosh*, we relied on *Greer v. Miller*, 483 U.S. 756 (1987). In *Greer*, the prosecutor asked the defendant on cross-examination why he did not tell his story about the murder. Following an objection by defense counsel, the trial court instructed the jury to ignore the question. The Supreme Court held that the admonition essentially cured any *Doyle* problem.

 Similarly, in the instant case, we view Captain Wolfe's comments as unsolicited and merely inadvertent. They were not the result of questions propounded by the prosecutor. We are also cognizant of the drastic nature of a mistrial. A mistrial should only be declared when there has been an error so prejudicial that justice cannot be served by continuing the trial, or when the fundamental fairness of the trial itself has been manifestly affected. *See King v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998); *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998). The trial court has wide discretion in granting or denying a motion for mistrial, which will only be granted when the possible prejudice could not be remedied by an admonition to the jury. *See Bell v. State, supra.*

 We are convinced that an admonition would have cured any prejudice resulting from the police officer's reference to McFarland's request for counsel. No such request was made. McFarland's counsel admitted at oral argument that the decision to rely on his mistrial motion and not seek an admonition was essentially strategic. We find no merit to this argument.

The record has been reviewed for other reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.