Lance Alan BRANSCUM *v.* STATE of Arkansas

CR 00-782                                         43 S.W.3d 148

Supreme Court of Arkansas
Opinion delivered May 17, 2001

*Robert L. Herzfeld, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

D ONALD. L. CORBIN, Justice. Appellant Lance Alan Branscum appeals the order of the Pulaski County Circuit Court convicting him of capital murder in the death of Julie Irmer. On appeal, Appellant argues that the trial court erred by: (1) denying his motion for a directed verdict; (2) admitting his custodial statement, because it was not given voluntarily; and (3) admitting certain photographs of the victim, because their prejudicial effect outweighed their probative value. Appellant was sentenced to a term of life imprisonment; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

The evidence presented in this case reveals that Appellant had been friends with the victim and her husband, Mark Irmer, for several years. The Irmers had allowed Appellant to move a travel trailer onto their property and live there prior to the murder of Mrs. Irmer. During the early morning hours of January 7, 1999, Mr. Irmer returned home from work to find Appellant standing in his driveway, smoking a cigarette. According to Mr. Irmer, Appellant offered to help him fix a headlight that was out on his truck. Mr. Irmer responded that he just wanted to go inside and get something to eat. Appellant then told Mr. Irmer that he wanted to have a talk with him; he eventually asked him to help replace a tire on his travel trailer. While Mr. Irmer was placing a jack under the trailer, Appellant grabbed him from behind and put a knife to his neck. Mr. Irmer jerked away and grabbed the knife from Appellant. He then ran to the back of his home and banged on a window while calling out his wife's name.

Appellant again tried to persuade Mr. Irmer to sit down and talk with him. He told Mr. Irmer that he and Mrs. Irmer had been planning to get rid of him, and that Mrs. Irmer never wanted to see him again. Appellant also told Mr. Irmer that he was having an affair with his wife. According to Mr. Irmer, Appellant suddenly went inside the Irmer's home and locked the door. Mr. Irmer then went to a neighbor's house for help and returned with his neighbor, Terry Hilliard. Mr. Irmer confronted Appellant on the home's front porch and told him that he just wanted to come in and get some of his things and then would leave. Appellant refused to allow Mr. Irmer to enter the home, again telling him that Mrs. Irmer did not want to see him. Mr. Irmer then went to the home of George Mitchell, another neighbor, and placed a 911 call.

Officers from the Pulaski County Sheriff's Office responded to the call. When they entered the Irmers' home, they discovered the body of Mrs. Irmer on the bathroom floor. Mrs. Irmer had on no clothing and her head was covered with a bloody laundry bag. The bag's drawstring was pulled tightly around her neck, and a jump rope was tied around her wrists. Authorities questioned Mr. Irmer, who told them about his altercation with Appellant. Police were unable to locate Appellant until several days after the murder. On January 12, 1999, authorities in Shawnee, Oklahoma, contacted the Pulaski County Sheriff's Office and reported that they had arrested Appellant.

The following day, Sergeant Terry Ward and Investigator Kerry Daulton traveled to Shawnee to take custody of Appellant and return him to Pulaski County. They first made contact with Appellant on the morning of January 14 in the Shawnee Police Department. Initially, Appellant denied having any knowledge of the murder of Mrs. Irmer. According to Ward, they sent Appellant back to his cell so that he could have lunch before the trip back to Arkansas. After lunch, Daulton went to Appellant's cell to outfit him in a Pulaski County Jail jumpsuit and body chains before transporting him back to Little Rock. According to Daulton, when he entered the cell, Appellant stated that he wanted to tell him two things. The first was that he wanted his wife to have the travel trailer. Secondly, he stated that he wanted to be interviewed again so that he could tell the truth about what had happened to Julie Irmer.

Ward and Daulton subsequently advised Appellant of his *Miranda* rights and then took a taped statement from him concerning the events surrounding the death of Mrs. Irmer. According to Appellant's statement, he had been having an affair with Mrs. Irmer for some time. On the night of her death, they were engaging in "rough sex," he claimed. Appellant stated that Mrs. Irmer wanted to find some handcuffs she had used before, but that Appellant suggested that they use a jump rope that was on the floor in the bedroom. Appellant then claimed that he tied Mrs. Irmer to the bedpost and while they were engaging in intercourse, she fell off the bed and hit her head on a nearby night stand. Appellant stated that he put a pair of panties and a plastic bag up to her head to try and stop the bleeding. When that did not work, Appellant claimed that he then put the laundry bag over her head to stop the blood flow. Appellant admitted that when he left the Irmers' home, Mrs. Irmer was dead. Ward and Daulton transported Appellant back to Little Rock, where he was charged with capital murder.

An omnibus hearing was held on October 19, 1999. The first matter considered by the trial court was Appellant's motion to suppress the statement he made to Ward and Daulton while in Oklahoma. Appellant claimed that he had not made the statement knowingly or voluntarily. In support of his contention, Appellant argued that he had gone for days without eating, was suffering from a headache at the time of the confession, and was threatened by Ward and Daulton. Appellant asserted that Ward and Daulton told him that he would receive the death penalty within a week. According to Appellant, Daulton also told Appellant that he worked for the district attorney's office and that if he gave a statement, the death penalty would be dropped. Appellant admitted, however, that he signed a form waiving his *Miranda* rights and did not ask for an attorney prior to giving his statement. After hearing the testimony of the officers and Appellant, the trial court determined that Appellant's statement was made voluntarily, and thus, denied his motion to suppress.

The trial court also heard arguments regarding the admission of photographs of the victim and the crime scene. Appellant argued that all of the State's photographs should be excluded because they were gruesome and inflammatory. Alternatively, Appellant requested that any pictures the State was allowed to introduce should be in black and white. The trial court reserved its ruling on the admissibility of the photographs until the point that they were offered into evidence. The trial court also denied Appellant's request that the State be required to submit only black and white photographs, noting that color pictures were used all the time. The trial court did state, however, that any color photograph that was unduly prejudicial would not be admitted into evidence. A jury trial was held on November 30 and December 1, 1999, and Appellant was convicted of capital murder and sentenced to life imprisonment. This appeal followed.

*Sufficiency of the Evidence*

■■ For his first point on appeal, Appellant asserts that the trial court erred in denying his motion for a directed verdict. We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.*; *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805

(1998). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999).

■ Appellant contends that the State failed to prove that he caused Mrs. Irmer's death deliberately or in a premeditated manner. Pursuant to Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997), a person commits capital murder if "with the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person." This court has held that premeditation is not required to exist for any particular length of time. *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899, *cert. denied*, 528 U.S. 933 (1999). It may be formed in an instant and is rarely capable of proof by direct evidence, but must usually be inferred from the circumstances of the crime. *Bangs*, 338 Ark. 515, 998 S.W.2d 738; *Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997). Similarly, premeditation and deliberation may be inferred from the type and character of the weapon, the manner in which the weapon was used, the nature, extent, and location of the wounds, and the accused's conduct. *Sanders v. State*, 340 Ark. 163, 8 S.W.3d 520 (2000). One can infer premeditation from the method of death itself, where the cause of death is strangulation. *Carmichael*, 340 Ark. 598, 12 S.W.3d 225; *Mulkey v. State*, 330 Ark. 113, 952 S.W.2d 149 (1997).

Here, Dr. Frank Peretti, an associate medical examiner with the State Crime Laboratory, testified that the victim's death was the result of "asphyxia due to obstruction of her air passages and strangulation and a blunt force injury." Dr. Peretti testified that the victim sustained numerous injuries to her hands, arms, and feet, and that her injuries were consistent with someone being "hogtied." Dr. Peretti also testified that petechial hemorrhages, a type of hemorrhage associated with asphyxia, were present on the victim's eyes. According to Dr. Peretti, the victim's neck would had to have been compressed for at least forty to sixty seconds to cause such hemorrhages. Dr. Peretti further testified that Mrs. Irmer was subjected to two different types of strangulation. First, there were injuries caused by ligature strangulation as a result of the drawstring being tied around her neck. Secondly, Mrs. Irmer was placed in a choke hold and strangled. Appellant admitted that he placed the laundry bag

over head, but claimed that it was an attempt to stop the bleeding. According to Dr. Peretti, however, the injuries on Mrs. Irmer's neck were not the result of someone simply putting the laundry bag over her head, but rather were caused by someone actually tying the bag around her neck.

Dr. Peretti also stated that it took significant force to cause the head injuries sustained by Mrs. Irmer. Dr. Peretti opined that a person could not fall out of bed and hit their head hard enough to cause the type of injuries suffered by Mrs. Irmer. Moreover, Dr. Peretti stated that there were no lacerations or cuts on the victim's head consistent with her banging her head on a piece of furniture. Thus, the medical evidence presented by the State proved that Mrs. Irmer's death was not the result of an accident, as Appellant claimed. This court has held that a jury is not required to lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. See *Terrell v. State*, 342 Ark. 208, 27 S.W.3d 423 (2000); *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997).

In addition, there was testimony from Mr. Irmer that Appellant attacked him with a knife and prevented him from entering his home on the night of the murder. Appellant admitted that when he left the Irmers' house, Mrs. Irmer was dead. Finally, Appellant not only fled the scene of the crime, but also the state. This court has held that flight from the place where a crime has been committed may be considered as evidence of guilt. *Dawan v. State*, 303 Ark. 217, 795 S.W.2d 50 (1990); *Jones v. State*, 282 Ark. 56, 665 S.W.2d 876 (1984). In sum, there was ample evidence to support Appellant's conviction of capital murder; thus, it was not error for the trial court to deny Appellant's motion for a directed verdict.

*Voluntariness of Statement*

For his second point on appeal, Appellant asserts that the trial court erred in denying his motion to suppress the custodial statement he made while in Oklahoma. Appellant argues that his statement was given involuntarily because at the time of the statement he was sleep-deprived; suffered from a migraine headache, had eaten very little, and was subjected to various forms of police coercion. We disagree.

■ ■ A statement made while the accused is in custody is presumptively involuntary, and the burden is on the State to prove, by a preponderance of the evidence, that a custodial statement was given voluntarily and was knowingly and intelligently made. *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998); *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). When determining voluntariness, the issue on appeal is whether the statement was the product of a free and deliberate choice, rather than intimidation, coercion, or deception. *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). In considering this issue, we make an independent determination based on the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Id.* Relevant factors to be considered include the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of mental or physical punishment. *Boone v. State*, 334 Ark. 452, 976 S.W.2d 921 (1998); *Sanford*, 331 Ark. 334, 962 S.W.2d 335.

■■■ Appellant claims that the circumstances surrounding his statement were coercive in nature, thus rendering his statement involuntary. His claims that he was tired, hungry, and had a headache are not supported by any evidence other than his own testimony. In fact, the transcript of his statement includes a question by Smith asking Appellant if he had had lunch, to which Appellant responded in the affirmative. There is nothing in the transcript of the statement to indicate that Appellant was anything other than alert and oriented. Appellant, who has a high school education, signed a waiver of his rights, and makes no challenge to the validity of that waiver on appeal. Indeed, the State introduced the waiver form signed by Appellant, and the transcript of his statement reflects that Ward went over his rights with Appellant before any questioning took place. This court has held that issues regarding the credibility of witnesses testifying at a suppression hearing are within the province of the trial court. *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998); *see also Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). "Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused since he or she is the person most interested in the outcome of the proceedings." *Wright*, 335 Ark. at 404, 983 S.W.2d at 401. Therefore, we cannot say that the trial court erred in finding the testimony of the two officers to be more credible than that of the Appellant.

██ ██ Appellant also claims that he was enticed by the promise of Daulton that the death penalty would be dropped if he gave a statement. This court has recognized that a statement induced by a false promise of reward or leniency is not a voluntary statement. *See Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999); *Clark v. State*, 328 Ark. 501, 944 S.W.2d 533 (1997). Here, however, the only evidence that Daulton made any promises to Appellant was Appellant's own self-serving testimony at the omnibus hearing. Daulton and Ward both testified that Appellant was never promised anything or threatened in order to obtain a statement. Again, the matter of weighing the credibility of witnesses is left to the trial court. *Wright*, 335 Ark. 395, 983 S.W.2d 397. Accordingly, we cannot say that the trial court erred in finding that Appellant's statement was voluntary, and thus, admissible.

## Admission of Photographs

Appellant's final point on appeal is that the trial court erred in admitting into evidence certain photographs of the victim because their prejudicial effect substantially outweighed their probative value. Specifically, Appellant alleges that certain photographs admitted into evidence were cumulative, overly graphic, and calculated to inflame the jury. This argument is without merit.

██ This court discussed the admission of photographs in *Camargo v. State*, 327 Ark. 631, 940 S.W.2d 464 (1997):

> Although highly deferential to the trial court's discretion in these matters, this court has rejected a *carte blanche* approach to admission of photographs. *Berry v. State*, 290 Ark. 223, 227, 718 S.W.2d 447, 450 (1986). We have cautioned against "promoting a general rule of admissibility that essentially allows automatic acceptance of all photographs of the victim and crime scene the prosecution can offer." *Id.* at 228, 781 S.W.2d at 450. This court rejects the admission of inflammatory pictures where claims of relevance are tenuous and prejudice is great, and expects the trial court to carefully weigh the probative value of photographs against their prejudicial nature. *Id.* at 228-29, 781 S.W.2d at 450. We require the trial court to first consider whether such evidence, although relevant, creates a danger of unfair prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value. *Beed v. State*, 271 Ark. 526, 609 S.W.2d 898 (1980). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403.

*Id.* at 637, 940 S.W.2d at 467.

■ ■ We first address Appellant's allegation that the challenged photographs were cumulative. With regard to pictures that depicted the victim of the body as discovered at the crime scene, the trial court overruled Appellant's objection to their admission on the basis that their probative value outweighed any prejudicial effect. The trial court found that they rebutted Appellant's claim that the victim had fallen off the bed and hit her head on the night stand. Specifically, the trial court noted that the pictures demonstrated that there were no open wounds on the victim or any excessive blood present. A close-up photograph of the victim's head and torso taken at the crime laboratory was needed to show the jurors the manner in which the bag's drawstring was knotted around the victim's neck. Appellant has asserted that he did not kill Mrs. Irmer with premeditation and deliberation. The photographs used to depict her many injuries establish that this crime was not accidental, but rather, was brutal and prolonged. This court has held that even the most gruesome photographs may be admissible if they tend to shed light on any issue, to corroborate testimony, or if they are essential in proving a necessary element of a case, are useful to enable a witness to testify more effectively, or enable the jury to better understand testimony. *Sanders*, 340 Ark. 163, 8 S.W.3d 520.

■ ■ Next, Appellant challenges several photographs that are close-up shots of the injuries inflicted on the victim's head and neck. The trial court allowed the photographs in because Dr. Peretti used them during his testimony to explain the numerous injuries suffered by Mrs. Irmer. Two final photographs challenged by Appellant depict the neck injuries caused by strangulation. This court has held that the need to show the condition of a victim's body, the probable type or location of the injuries, and the position in which the body was discovered is an acceptable purpose for admitting photographs. *Stewart v. State*, 338 Ark. 608, 999 S.W.2d 684 (1999). Thus, it was not error for the trial court to admit these photographs.

■ Finally, we consider Appellant's argument that the color photographs were somehow more prejudicial than black and white photographs would have been. Appellant does not argue which photographs should have been submitted in color, nor does he submit any photographs in black and white, thereby demonstrating how they are less gruesome. He simply asserts that this court, by implication, has previously stated that color photographs are more inflammatory. Appellant cites no authority for this proposition, nor

did he raise this argument below. It is well settled that this court does not consider an argument raised for the first time on appeal. *Windsor v. State*, 338 Ark. 649, 1 S.W.3d 20 (1999).

## 4-3(h) Review

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found. For the aforementioned reasons, the judgment of conviction is affirmed.