Charles Allen WINSTON *v.* STATE of Arkansas

CR 06-596                                                    243 S.W.3d 304

Supreme Court of Arkansas
Opinion delivered November 16, 2006

*William R. Simpson, Jr.*, Public Defender, *Tjuana Byrd*, Deputy Public Defender, by: *Clint Miller*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen. and *Maggie C. B. Smith*, Law Student No. 937 Admitted to

Practice Pursuant to Rule XV(E)(1)(b) of the Rules of Governing Admission to the Bar of the Supreme Court under the Supervision of *Darnisa Evans Johnson*, Deputy Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Charles Allen Winston stood trial before a jury in the Pulaski County Circuit Court on charges of kidnapping, aggravated assault, battery in the first degree, and aggravated robbery. The jury found Winston guilty on all counts. Winston now appeals his aggravated-robbery conviction. Because he had seven prior felony convictions, Winston was sentenced to life imprisonment for the aggravated-robbery and kidnapping convictions pursuant to Ark. Code Ann. § 5-4-501 (Repl. 2006). We therefore have jurisdiction over the instant case pursuant to Ark. Sup. Ct. R. 1-2(a)(2).

Winston met the victim Rose Marie Rivers at a concert in April 2004. The two spent the weekend together, having sexual relations at Rivers's home. Rivers, however, decided not to pursue a romantic relationship with Winston. In January 2005, Rivers ran into Winston at a store, and they agreed that Winston would assist Rivers in fixing up her new home. Shortly thereafter, Winston acquired some furniture that he wanted Rivers to purchase. She agreed to go to his house and take a look at the furniture; so, they arranged to meet on March 2, 2005, and travel together to Winston's home in Sweet Home.

On the evening of March 2, Rivers had to work late and decided that she was too tired to look at the furniture.[1] She and Winston met at a liquor store on Martin Luther King Boulevard, and Winston got into Rivers's car. Rivers told Winston that she was too tired to view the furniture but that she would take him home after she stopped by her mother's house to feed her dog. Upon hearing this, Winston began complaining that Rivers was not following through with their original plans.

When they arrived at her mother's home, Rivers turned off the ignition, took the keys, and began preparing the dog's food in the garage. Then, she heard the car door slam, and when she rose Winston began hitting her. A struggle ensued and, as she was

---

[1] Winston apparently became concerned when Rivers did not get off work on time, and he repeatedly called her on her cellular phone and dropped by her house. While at Rivers's house, he asked Rivers's mother, Mary Marie Rivers, who was staying there at the time, about Rivers's whereabouts.

trying to escape Winston, Rivers fell and broke her nose on the driveway pavement. Winston then shoved Rivers partially into the car and continued beating her while repeatedly saying "give me the keys." In an attempt to get the keys from Rivers's grip, Winston bit off the tips of two fingers on her right hand. She released the keys, and he shoved the rest of her body into the car.

A neighbor, Arzell Phillips, testified at trial that he heard the sound of a woman screaming "help me" coming from the house. When he approached the driveway, he saw a man, presumably Winston, bent over a woman who was partially inside a car. Phillips stated that he saw the man's arm moving up and down in a "hitting" motion. Phillips yelled out a warning, and the man looked in Phillips's direction and shoved the woman fully into the car. The man then reversed the car so quickly that the car hit an embankment across the roadway and stalled for few minutes before the driver restarted the car and drove away.

As Winston was driving the car, Rivers decided that she must try to escape the car or risk being killed by Winston. When Winston had to stop the car at a railroad crossing, Rivers tried to exit the car through the passenger's side door, but Winston wrapped her long hair around his hand and arm.[2] Keith Jones, who was staying at the Union Rescue Mission nearby, was among a group of people who witnessed Rivers's attempted escape. Jones tried to grab Rivers's hand and unwrap her hair from Winston's arm; however, Winston hit Jones with an object, forcing him to abandon the rescue attempt.[3] The car then sped off with Rivers partially outside the car. Rivers was dragged for several feet, until Winston realized his apprehension by police was imminent and stopped the car.

The Little Rock Police promptly arrived on the scene. According to Officer David Green, the car was in the wrong lane of traffic, with Winston sitting in the passenger's seat and Rivers sitting in the middle of the road. By Green's account, Winston "looked fine" except for a bit of blood on his coat. Rivers, on the other hand, looked "pretty messed up" because her face was

---

[2] At the time of the incident, Rivers wore long braids in her hair that reached to the small of her back. Crime scene photographs of the car depicted a blood spattered interior with large chunks of braided hair wrapped around the gear shift.

[3] Winston's actions towards Jones resulted in the aggravated-assault conviction mentioned earlier.

covered with blood and injuries, she was missing two fingertips, and the skin on her left foot was peeled back so that her muscles and bones could be seen.

Rivers was transported to Baptist Hospital. When she arrived there, her left leg had to be amputated below the knee, a laceration on her knee had to be repaired, and the skin was closed over the severed ends of her fingers. She also had a massive facial edema, a broken nose, some loose teeth, a broken tooth, and several bruises and lacerations.

Meanwhile, Winston was taken to the Little Rock Police Department where he gave a taped statement before Detective Ronnie Smith. Winston told police that he and Rivers were romantically involved and that he had confronted her that night because he thought she was cheating on him. According to Winston, after Rivers realized that he had "caught her in a lie," she began to panic and began hitting him. Winston decided that he had to get the situation under control and if he could just get Rivers to go to his house as planned, everything would be alright. He explained that all of Rivers's injuries resulted from the domestic struggle and insisted that he only hit her once, in defense.[4]

At trial, the State presented the testimony of many witnesses: Rivers, Jones, Phillips, the investigating officers, and the doctors who treated Rivers. The jury heard Winston's taped statement and his testimony, which was similar to his statement. The State also presented crime scene photographs that corroborated Rivers's account of the events. Winston moved for a directed verdict at the end of the State's case-in-chief and renewed his motion before the case was submitted to the jury. The circuit court denied both motions. For his single point on appeal, Winston argues that the circuit court erred when it denied his directed-verdict motions.

On appeal, a directed-verdict motion is treated as a challenge to the sufficiency of the evidence. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999). When reviewing the sufficiency of the evidence, we must determine whether the verdict is supported by substantial evidence. *Nichols v. State*, 280 Ark. 173, 655 S.W.2d 450 (1983). Substantial evidence, whether direct or circumstantial, must be of sufficient force and character that it will, with reason-

---

[4] Winston explained Rivers's severed fingertips by stating that she forced her fingers into his mouth to scratch him and that he accidentally bit down on her fingers when the car hit the embankment.

able and material certainty and precision, compel a conclusion one way or the other. *Jones v. State*, 269 Ark. 119, 598 S.W.2d 748 (1980). The evidence must force or induce the mind to pass beyond suspicion or conjecture. *Nichols v. State, supra.* The test for sufficiency of the evidence is not satisfied by evidence that merely creates a suspicion or that amounts to no more than a scintilla or that gives equal support to inconsistent inferences. *Id.* Evidence is not substantial if the fact-finder is left to only speculation and conjecture in choosing between two equally reasonable conclusions, and merely gives rise to suspicion. *Id.* A directed verdict should be granted where there is no evidence from which the jury could have found, without resorting to surmise and conjecture, the guilt of the defendant. *Id.* Also, when determining the sufficiency of the evidence, it is necessary for this court to ascertain only the evidence favorable to the appellee State, and it is permissible to consider only that testimony that supports a verdict of guilt. *Gardner v. State*, 296 Ark. 41, 754 S.W.2d 518 (1988).

Winston argues that his directed-verdict motions should have been granted because the State did not present sufficient evidence to prove the theft element of robbery. He asserts that the fact that he did not actually take the car completely from Rivers's possession and the fact that he did not flee from the police shows that he did not have the intent to steal Rivers's car.

Pursuant to Ark. Code Ann. § 5-12-103(a)(3) (Repl. 2006), a person commits aggravated robbery when he or she commits a robbery and "inflicts death or serious injury upon another person." *Id.* A robbery is committed when a person employs or threatens immediate use of physical force upon another person with the purpose of committing either felony or misdemeanor theft or resisting apprehension after committing theft. Ark. Code Ann. § 5-12-102(a) (Repl. 2006). A theft occurs when a person knowingly "takes or exercises unauthorized control over . . . the property of another person, with the purpose of depriving the owner of the property." *Id.* § 5-36-103(a)(1). A person can deprive another person of his or her property in three ways:

(A) *Withhold property* . . . either *permanently* or under circumstances such that a major portion of its economic value, use, or benefit is appropriated to the actor or lost to the owner.

(B) Withhold property . . . with the purpose to restore it only upon the payment of a reward or other compensation; or

(C) Dispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely.

*Id.* § 5-36-101(4) (emphasis added).

### A. *Withholding Property for the Purpose of Permanent Deprivation*

Winston specifically contends that he did not have the intent to commit the theft of Rivers's car because at most he temporarily deprived Rivers of the control of her vehicle. Winston's reliance on this proposition is misplaced. In past cases, we have stressed that the focus of aggravated robbery is on the physical force used or threatened and if the defendant has the intent to commit a theft, no actual transfer of property needs to take place for the offense to be complete. *Williams v. State*, 351 Ark. 215, 91 S.W.3d 54 (2002). Also, in *Moore v. State*, 299 Ark. 532, 773 S.W.2d 834 (1989), we clarified that the theft statute, Ark. Code Ann. § 5-36-103(a)(1), makes no exception for a "temporary deprivation." *Id.* at 536, 773 S.W.2d at 837.

In *Moore v. State, supra,* the appellant took the victim's car from a parking lot with her young child inside, but Moore later abandoned the car and the child. *Id.* On appeal he claimed that he did not intend to permanently deprive the victim of her car, but rather he only wanted to borrow the car for a temporary period. *Id.* This court determined that the evidence was sufficient to show that Moore intended to permanently deprive the victim of her car for at least the time that he was in possession of it, if not longer, and because no exceptions are made for temporary deprivations, we concluded that Moore did have the requisite intent to commit theft and affirmed his conviction. *Id.*

As in *Moore,* the jury in the instant case could have concluded from the evidence that Winston intended to permanently deprive Rivers of her property for at least the time he was in possession of it. Here, the jury heard testimony from Rivers that Winston continuously beat her while requesting the car keys and even resorted to biting off her fingertips to get the keys. Rivers also testified that Winston took complete control of her car and would not let her escape. This testimony was corroborated by witnesses Arzell Phillips and Keith Jones, who both attempted to help Rivers. Winston himself admitted that he was controlling Rivers and her car so that he could achieve his original objective — getting Rivers to his home to view and purchase the furniture.

Thus, a jury could reasonably conclude that even if Rivers was never completely expelled from the car, Winston took control of the car for his own purposes, thereby exercising constructive possession of Rivers's car. What is more, even if the deprivation here was only temporary, under *Moore* a temporary deprivation can be sufficient to establish the requisite intent-to-commit-a-theft element of an aggravated robbery charge.

Furthermore, the jury heard extensive evidence that tended to refute Winston's story that Rivers was the initial aggressor and that, as her boyfriend, he only wanted to temporarily use her car. First, while Winston testified he and Rivers merely "wrestled" in the driveway, Arzell Phillips testified that he saw a man beating Rivers, and crime scene photographs depicted the driveway as being covered by large splatters of blood. Also, Winston alleged that he only restrained Rivers from escaping the car by holding her hand, but Keith Jones testified that Winston was holding Rivers by her hair and crime scene photographs revealed the car's bloody interior and large chunks of hair wrapped around the car's gear shift. Additionally, Officer Green testified that Winston "looked fine" when police arrived on the scene, but Rivers was in very poor physical shape. Finally, the evidence of the brutal force that Winston employed to take control of Rivers and the car indicates that he did not intend to simply borrow the car from Rivers to go to his house, especially when one considers that Rivers had already agreed to take Winston home. Rather, the evidence points to the conclusion that he intended to permanently deprive Rivers of her car, even if his plan never came to fruition.

We have held that the determination of the credibility of trial witnesses and the weighing of evidence are solely within the province of the jury, and the jury is entitled to disbelieve the testimony of an accused. *Moore v. State*, 315 Ark. 131, 864 S.W.2d 863 (1993); *see also Jones v. State, supra.* Moreover, an accused's improbable explanation for suspicious circumstances may be admissible as proof of his guilt. *Jester v. State*, 367 Ark. 249, 239 S.W.3d 484 (2006). Basically, the jury was not obligated to believe Winston's explanation of the events — that he believed that everything would be okay once he got Rivers to his house even after he inflicted such severe injuries on her — and could view his story as another indicator of his guilt. Accordingly, they were free to determine that Winston meant not only to temporarily deprive

Rivers of her car but also to cause a permanent deprivation. The jury's verdict is supported by substantial evidence that Winston intended to commit the theft of Rivers's car. Thus, we conclude that the circuit court did not err in denying his directed-verdict motions.

Winston cites the Arkansas Court of Appeals's decision in *Greer v. State*, 77 Ark. App. 180, 72 S.W.3d 893 (2002), for the proposition that this court should not affirm the circuit court when a defendant only intended to temporarily control the victim's property. The facts in *Greer*, however, are not at all similar to the facts here. In that case, the accused was convicted of the theft of his mother's car, but the record revealed that the accused lived with his mother and had a habit of taking the car without her permission. *Id.* Additionally, the accused's mother made it a regular practice to call the police when her son did not return the car "on time." *Id.* The court of appeals determined that *Moore v. State*, *supra*, did not apply and concluded that the judgment against the accused was not supported by substantial evidence. *Id.*

*Greer* presented a very different situation from that in *Moore* and the instant case. In *Greer* the accused had established a pattern of taking his mother's car and returning it after he was done. *Greer v. State, supra*. Thus, a reasonable juror could not infer, beyond the bounds of speculation and conjecture, that Greer intended to permanently deprive his mother of her vehicle. *Id.* Unlike the situation in *Greer*, in *Moore* and the instant case the victims' cars were taken by force, which evidence is sufficient to support the jury's conclusion that the accused did not intend to return the car to the victim. In sum, *Greer* is inapposite here.

### B. *Rule 4-3(h) Review*

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Appellant Charles Allen Winston, and no prejudicial error has been found. *Doss v. State*, 351 Ark. 667, 97 S.W.3d 413 (2003).

Affirmed.