Timothy BOYD *v.* STATE of Arkansas

CR 06-973                                    253 S.W.3d 456

Supreme Court of Arkansas
Opinion delivered March 15, 2007

*William R. Simpson, Jr.,* Public Defender, *Sharon Kiel* and *Bret Qualls,* Deputy Public Defenders, by: *Erin Vinett,* for appellant.

*Dustin McDaniel,* Att'y Gen., by: *Kent G. Holt,* Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Timothy Boyd brings the instant appeal from his convictions of one count of capital murder and three counts of aggravated assault. He was

sentenced to life imprisonment for the capital-murder conviction and to a six-year sentence for each of the aggravated-assault convictions, to be served concurrently with the life sentence. On appeal, Boyd raises two points of error: (1) the circuit court erred in denying his directed-verdict motion because the evidence was not sufficient to prove the mens rea element of capital murder, and (2) the circuit court erred in allowing the State to mischaracterize how the transition between a charged offense and lesser-included offenses should be addressed during jury deliberations. We find no error and affirm.

Boyd and the victim, Andrea Martin, pursued a ten-year relationship from the time they were teenagers until Martin's death. In 2003, they moved to Little Rock from their hometown of Crossett. During the summer of 2005, the relationship ended, and Martin moved out of the apartment she shared with Boyd on Reservoir Road. A few weeks later, she rented an apartment in a different complex of apartments on the same street. Just prior to the breakup, Martin's friends and co-workers noticed she had a black eye.

On the evening of July 15, 2005, Martin threw a house-warming party at her new home and invited family and co-workers. As the party wound down, Martin's co-workers, Jennifer Johnson and Chastity Savannah, made their way to the parking lot and began talking. Martin's apartment was in a split-level building located on a steep slope. From the parking lot where the two women were standing, they could see into another parking lot below. After about thirty minutes, Johnson and Savannah saw Boyd pull his car into the lower parking lot and climb a flight of stairs toward Martin's apartment. Worried about Martin's safety, Johnson called Martin to warn her that Boyd was approaching.

A few minutes later, Johnson and Savannah heard Martin screaming and saw Boyd chasing Martin as she ran around the corner of the building. Martin tumbled down the nearby slope and began begging Boyd not to hurt her. He grabbed her and began beating her in the head with a pistol. He then fired one shot into the ground and began dragging Martin toward her apartment while holding a gun to her head. As he passed by Johnson and Savannah, Boyd pointed his gun at the women and ordered them to leave. Savannah left, and Johnson hid behind a nearby dumpster and called 911.

Meanwhile, Chandra Watson, who also lived in the apartment complex, came outside and tried to reason with Boyd. She

had known Boyd and Martin in Crossett. Boyd told Watson that he was going to kill Martin, and he threatened to kill her also if she did not leave him alone. Boyd next proceeded to drag Martin down a flight of stairs to the level below her apartment. Shots were then fired, and Martin stopped screaming.

Within minutes, police officers arrived and converged on Martin's apartment. As the officers approached the door to the apartment, which was open, they identified themselves and yelled for anyone inside to "come out with your hands up." Upon hearing Boyd's voice from the stairwell below, saying, "No, I want to call my brother," the officers moved toward the top of the stairwell and saw Boyd crouching over Martin's body with a pistol in one hand and a cellular phone in the other. The officers identified themselves again and asked him to drop his gun. He refused and repeated that he wanted to call his brother. The officers asked him again to drop his weapon. Instead of complying, Boyd stood up and raised his gun toward the officers, whereupon they opened fire, shooting Boyd twice.

Boyd was charged with one count of capital murder for the death of Martin and three counts of aggravated assault in connection with the threats directed at Johnson, Savannah, and Watson. At trial, the medical examiner, Dr. Daniel Konzelman, testified that Martin sustained several gunshot wounds. She died of one close-range gunshot to her face, which passed through her neck, lacerating her spinal cord. Martin also sustained two other close-range gunshot wounds to her abdomen and chest. One long-range gunshot left four wounds in her leg. In addition to those wounds, Martin suffered small abrasions and scrapes all over her body and a laceration under her chin that was caused by a blow from a blunt object, possibly a pistol.

Watson also testified for the State. She stated that a few days before the shooting, Boyd came to her work and told her that he wanted to kill Martin because she was sleeping with another man. Stacy Walker testified that she began a romantic relationship with Boyd after he and Martin broke up. Shortly before the shooting, Boyd told Walker that Martin was seeing another man, which made him want to shoot Martin and her new lover. Ebony Henderson testified that she visited Boyd on the day before the shooting because he was "suicidal." While she was with him, Boyd allegedly told Henderson that he had a plan to go to Martin's apartment, shoot Martin and her lover, and force the police to shoot him when they arrived.

Boyd took the stand in his defense and testified that he and Martin had a good relationship before the breakup and that he was hoping to reconcile with her. He alleged that a few days before the shooting Martin left him a voice message in which he heard her having sex with another man. Nevertheless, he insisted that he was joking when he told Watson and Walker that he planned to kill Martin.

Boyd asserted that on the night of the shooting, he had been drinking heavily at a friend's house. Then, he was going to his sister's home, which was located in a rough part of town, so he stopped at his apartment and picked up his gun. On the way to his sister's, Boyd dropped by Martin's home for a visit, but Martin became hysterical when she saw his gun. According to Boyd, Martin fell as she ran away from him, and he helped her get up. By that time, such a commotion had ensued that Boyd fired a shot into the ground in order to get her friends to be quiet. He and Martin began to walk toward her apartment, but when Boyd realized that the police were coming, he took his gun out of his pocket for the purpose of hiding it. As related by Boyd, Martin reached for the gun three times, and each time the gun fired, culminating in three separate gun shots. Boyd also testified that he did not refuse to drop his gun; rather, the police just opened fire on him without reason.

After he was found guilty on all counts, Boyd waived sentencing by the jury. The circuit court sentenced him to a term of life imprisonment for the capital-murder conviction and seventy-two (72) months for the aggravated-assault convictions, to be served concurrently with the life sentence.

### Sufficiency of the Evidence

For his first point on appeal, Boyd argues that the State did not present sufficient evidence to prove that he had the requisite mens rea to commit capital murder. Specifically, he claims that Martin was shot accidentally. This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence. *Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004). In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Id*. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id*. This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id*.

A person commits capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Repl. 2006). The necessary premeditation and deliberation is not required to exist for a particular length of time and may be formed in an instant. *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899 (1999). This court has long acknowledged that intent can rarely be proven by direct evidence. *Id.* However, a jury may infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used, the nature, extent, and location of the wounds inflicted, and the conduct of the accused. *Id.* In addition, we have affirmed capital-murder convictions when a defendant made past statements about his desire to kill the victim. *See Lloyd v. State*, 332 Ark. 1, 962 S.W.2d 365 (1998).

Here, the jury heard evidence that Boyd shot Martin three times at close range and that she died of a fatal gunshot wound to the head. While Boyd asserts that the shots were fired accidentally and he did not intend to hurt Martin, the testimony of other witnesses indicates otherwise. Johnson, Savannah, and Watson testified about Boyd's threatening behavior immediately prior to the shooting — namely, he pistol-whipped Martin and dragged her around the apartment complex with a gun to her head, and he told the witnesses he would also kill them. Furthermore, three witnesses testified that, on three separate occasions, Boyd said he wanted to kill Martin. The duty of resolving conflicting testimony and determining the credibility of witnesses is left to the discretion of the jury. *Burns v. State*, 323 Ark. 206, 913 S.W.2d 789 (1996). Additionally, the jury is entitled to disbelieve any portion of a witness's testimony, including that of the accused. *Winston v. State*, 368 Ark. 105, 243 S.W.3d 304 (2006). Accordingly, we conclude that there was sufficient evidence to support the jury's verdict.

## Deliberation of Lesser-Included Offenses

Boyd's second point on appeal concerns a portion of the prosecutor's remarks during closing argument in which he explained how the jury should consider lesser-included offenses during deliberations. The prosecutor said in part:

> Beneath the capital murder cup is murder in the first degree. The only way that you ever look at the law or try and apply the facts to

the murder in the first degree instruction is if all 12 of you decided that he's not guilty of capital murder.

Defense counsel objected to the prosecutor's remarks as being an improper mischaracterization of the law. He argued that the jurors were not required to reach a unanimous decision to acquit Boyd of capital murder before they could consider the lesser-included offense of first-degree murder. Instead, he claims, if any of the jurors were unable to agree on a verdict as to the charged offense of capital murder, they could proceed to consider the lesser offense.

The instruction given by the circuit court was AMI Criminal 2d 302, Lesser Included Offenses: Transitional Instruction, which states, "[i]f you have a reasonable doubt of the defendant's guilt on the charge of capital murder, you will then consider the charge of murder in the first degree." Boyd contends that the word "you" in the instruction can be used in either a plural form, to indicate the entire jury panel, or a singular form, to indicate one juror. He asserts on appeal that the instruction in question should be interpreted as using the singular form, and, therefore, the jury is not required to reach a unanimous decision on a charged offense before considering a lesser-included offense.

In essence, Boyd argued below and now argues on appeal that the meaning of the term "you" in AMI Criminal 2d 302 is ambiguous. It was incumbent upon him to proffer an additional instruction in order to clarify a purported ambiguity in the instruction. See Ark. R. Crim. P. 34.1 (2006). Yet, Boyd failed to proffer an instruction containing what he saw as a correct statement of the law on the proper interpretation of the term "you" in AMI Criminal 2d 302. Boyd's counsel simply challenged the prosecutor's explanation of the instruction. This failure to proffer an additional instruction precludes us from considering Boyd's argument on appeal. Dixon v. State, 327 Ark. 105, 937 S.W.2d 642 (1997); Orsini v. State, 284 Ark. 348, 655 S.W.2d 245 (1984).

### Rule 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Boyd, and no prejudicial error has been found. Doss v. State, 351 Ark. 667, 97 S.W.3d 413 (2003).

Affirmed.