2009 Ark. 600

**Kenneth Lee LAWSHEA, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 09–629.**

Supreme Court of Arkansas.

Dec. 3, 2009.

Lott Rolfe, IV and Gerald A. Coleman, North Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by Brad Newman, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice.

Appellant Kenneth Lawshea was convicted as an accomplice in the murder of Shirley Barnett–Lambert, who was stabbed to death in her home on July 14, 2007. Appellant now appeals his conviction, arguing that the State failed to prove he acted with premeditation and deliberation. Because this is a criminal appeal in which life imprisonment has been imposed, this court has jurisdiction pursuant to Ark. Sup.Ct. R. 1–2(a)(2). We affirm appellant's conviction.

In a felony information filed November 21, 2007, appellant was charged with capital murder in the death of Shirley Barnett–Lambert. Appellant waived his right to a jury trial, and on February 18 and 19, 2009, a bench trial was held. The following pertinent testimony was presented at trial. David Flora, head of the Criminal Investigation Division of the Blytheville Police Department, testified that, in July 2007, his caseload consisted of mostly drug cases and that Shirley Lambert was one of his confidential informants. He testified that she was a key witness in a case against Joseph Sherman (a.k.a. "Handy"), that she was scheduled to testify on July 23, 2007, and that she was murdered on July 14, 2007.

Billy Lambert, the victim's husband, testified that he and Lambert had been married for two years. He testified that he had been in prison before and that he knew appellant from prison. He also testified that he was unaware that appellant and Lambert had sometimes used drugs together.

Bobby Trump, the current Gosnell Police Department Commissioner, was a detective for the Blytheville Police Department at the time of the murder. He testified that he was one of the lead detectives on the case. Trump testified that, at the crime scene, there was blood splatter on the side of the house next to the carport door; a yellow shirt with bloodstains on it lying on the kitchen floor, and blood smears on the bedroom door. The victim was found lying on the floor in the bedroom. Trump testified that the blood splatter on the wall, as well as the blood on the yellow shirt, matched the blood of Clarence Kelly.[1] The yellow shirt was identified as belonging to Billy Lambert, who said the shirt had been hanging on a clothes rack in the bedroom. The blood on the bedroom door was identified as a mixture of the victim's blood and appellant's blood. Trump testified that the victim had a black eye and had received some type of blunt force injury. The victim also had numerous slash marks and stab wounds around her neck area, wounds on her arms and hands, and several deep lacerations to her face.

Trump also testified that the police had received a couple of anonymous tips stating that two men were seen leaving the victim's house approximately thirty minutes before the police arrived, that the

---

1. Clarence Kelly was appellant's accomplice who, previous to this trial, pled guilty to first-degree murder and was sentenced to fifty-five years' imprisonment.

men got into a red car, and that one of the men was believed to be appellant. Trump testified that on July 20, 2007, appellant was picked up on a warrant issued for failure to make payments and was questioned about the murder. Trump testified that, when he approached the holding cell, he noticed a large band-aid over appellant's hand. Appellant told Trump that he had cut his hand on a beer bottle. The detectives photographed the cut and gave appellant a new band-aid. The detectives also fingerprinted appellant and took palm prints, and in the process got ink on the band-aid, so appellant was given a second clean band-aid. Trump testified that appellant denied any involvement in the murder. Trump stated that after the interview was over, he sent the two used band-aids to the crime lab, and the DNA from the band-aids matched the DNA found on the bedroom door.

Trump testified that, after receiving this positive DNA match, he submitted an affidavit for an arrest warrant. Detectives located appellant in Cleveland, Ohio, where he was taken into custody by local authorities. Trump testified that he went to Cleveland and obtained an oral DNA swab from appellant, which was also a positive match to the DNA found on the bedroom door. Trump testified that he transported appellant back to Blytheville. Trump also clarified for the court that the murder weapon had not been retrieved.

Steve Caudle was another detective for the Blytheville Police Department who participated in the investigation. He testified that he first came in contact with appellant during the traffic stop that occurred on July 20, 2007, and that at that time, appellant denied any knowledge of the murder. Caudle next came in contact with appellant on September 27, 2007, when he went to Cleveland, Ohio, to arrest appellant. Caudle testified that, at first, appellant again denied being at the murder scene, but, after being confronted with the DNA evidence, appellant later spoke to him about the murder in Cleveland and on the way back to Arkansas. Caudle testified that a taped statement was taken on September 28, 2007, after appellant waived his rights. The taped statement was then played for the court.

In his statement, appellant explained that he had been approached by his girlfriend's brother, Clarence Kelly, about making some "quick easy money" by murdering Shirley Barnett (Lambert), for which they would be paid $7500. Kelly told appellant that Handy (Joseph Sherman) and Willie Ivory had put the hit on Shirley Barnett. Appellant told Kelly that he wasn't interested, but Kelly continued to ask him about it several more times. One morning, Kelly came to his house and asked if he had any "stems" to smoke dope with and suggested they go get one from Lambert.[2] Appellant agreed, and he, Kelly, Angela (appellant's girlfriend and Kelly's sister), and another man called "Shorty Gimp" went to Lambert's house. They drove to Lambert's house in a red, four-door Malibu or Impala. Appellant went into Lambert's house alone, but once inside, Kelly also entered the house behind him. Lambert went to the back bedroom to get the stem, and Kelly followed her. After a few minutes, appellant heard a "clump" sound and went to see what was going on. He entered the bedroom and saw Kelly on the floor, sitting on Lambert and stabbing her with a knife. Appellant said he attempted to stop Kelly, but Kelly stabbed him, too. Appellant stated that he then ran out of the house because he didn't want anything to do with what was happening.

2. A "stem" is a glass pipe used to smoke drugs, usually crack cocaine.

Appellant also stated to Caudle that, after the murder, Kelly came to his house and gave him $200 as hush money. He also stated that a few days after he was questioned by the police on July 20, he was beaten up by several men, who told him to keep his mouth closed. He said the men then took him to a bus station in Sikeston, Missouri, and gave him another $200. He said the men were driving the same red car, which he identified as belonging to Kelly's wife.

Appellant also explained in his statement that he had been having an affair with Lambert since April and that Kelly knew he was seeing her. He stated that Kelly had used him to get to Lambert, because she was not the type of person to just let anyone into her house. He also stated that he had gone with Kelly to see Willie Ivory and Handy a couple of times. He said he saw Willie give Kelly balls of dope, and he saw Handy give Kelly some money. He said he did not know how much money Kelly received from Handy or Willie.

Dr. Daniel Konzelmann, a medical examiner for the State, testified that the victim's cause of death was stab and cutting wounds with blunt force injuries. Dr. Konzelmann stated it was a homicide, and the appearance of the body indicated that there was likely a struggle. He testified that the victim had approximately forty-seven stab wounds. On cross-examination, he testified that in similar situations, there have been instances where the perpetrator injured him or herself in the attack, and depending on how the knife was held, injuries may occur on the palm of the hand or on the inside of the fingers. Regarding the picture of appellant's wound on his hand, Dr. Konzel-

mann testified that if the picture was taken five or six days after the injury was received, it would be hard to tell if it was caused by a knife, because the amount of healing makes it hard to tell what the original injury was. He testified it was not a typical stab wound because it was not deep.

■ After the State rested, appellant moved for a dismissal, arguing that there was "no evidence of a premeditated, deliberate murder on behalf of the Defendant."[3] The State argued that, based on appellant's statement alone, there was proof of premeditation, because appellant stated he had been approached by Kelly several times about killing Shirley Barnett, and that appellant had brought Kelly over to the victim's house the day of the murder. The motion was denied.

Appellant then testified and explained that he knew Kelly through Kelly's sister, Angela, whom he had known for about twenty-five years. He testified that, in January 2007, he had recently moved back to Arkansas from Ohio to help Angela take care of her children. He stated that he saw Kelly and that Kelly told him he "knew a lick" that would pay about $7500, that "it would take two people to do her," and that it "would have to be with somebody he could trust." Appellant said he thought Kelly was referring to a robbery, but after he was told it was a hit on Lambert, he told Kelly he "didn't do anything like that."

Appellant testified that Kelly asked him about the hit again in February, and he again said he was not interested. Appellant said he began using drugs, and his drug addiction got "real bad." He testified that, around the end of March, he was

3. While appellant actually characterized his motion as a motion for directed verdict, a challenge to the sufficiency of the evidence in a bench trial is properly termed a motion to dismiss. See Ark. R.Crim. P. 33.1(b) (2009).

walking late one night and saw Lambert drive by. She stopped and asked appellant if he had any cocaine, which he did, and the two of them got high. Their relationship eventually became intimate, and appellant would visit Lambert in her home when her husband was at work.

Appellant testified that, at the end of May, Lambert told him that Clarence Kelly had "propositioned" her and wanted to pay her $200 for sex. At that time, Lambert told Kelly that she and appellant were "messing around." Also at that time, appellant was living with Angela, his girlfriend, who lived right around the corner from Lambert. Also around that time, Kelly again asked appellant if he had "been thinking about" the hit on Lambert, and appellant again told him he wasn't interested.

Appellant did not see Kelly again until the Fourth of July at a family gathering. Then, on July 14, Kelly came to appellant and Angela's home that morning with some crack cocaine. According to appellant, Kelly told him, "We gonna get high, we gonna make this money, and we gonna cook this dope." Angela, appellant, Kelly, and a man called "Shorty" got in Kelly's car, and Kelly asked if appellant could go over to Lambert's house to get some "tools," meaning crack pipes and other tools used to cook dope. Appellant agreed to get some tools from her, and Angela drove them to Lambert's house. Appellant approached and entered the house through the carport door; Kelly then followed behind him a few minutes later. Appellant said that Kelly was rushing Lambert to get the tools they needed, and Kelly followed her when she went to the bedroom to get them. Appellant said Kelly closed the bedroom door. Several minutes passed, and appellant heard a "bump" or "clump" sound. He testified that he thought Kelly might be taking advantage of Lambert or trying to force himself on her, so he went into the bedroom, and there he saw Kelly on top of Lambert, stabbing her. Appellant testified that Kelly kept saying "The bitch got to die," and appellant yelled at him, saying "This ain't right." Appellant stated that he reached out and Kelly stabbed at him with the knife. Appellant left the bedroom, left the house, and went back to the car. Appellant testified that he was hollering about Kelly stabbing "that girl," and Shorty pulled out a pistol and told appellant to get in the car.

Appellant testified that after Kelly came back to the car and dropped Angela and appellant off at home, he began drinking and went to take a shower. When he undressed, he realized he had been stabbed in the leg. A short time later, Kelly returned and gave appellant $200, saying "Here's $200 hush-hush money. They know your son work at Milwaukee tool." Appellant stated that after his child was threatened, he felt there was nothing he could do but go along with what happened.

Appellant testified that when the police stopped him the next week, he initially denied having any knowledge of the murder. He testified that they brought him to the police station and interviewed him in a back room, and at that time, he told them that he knew they believed he knew something about Lambert's death and that he was willing to do whatever. He denied that his fingerprints or blood would be found in Lambert's house.

Appellant testified that the night after he was interviewed by the police, he was driving home intoxicated from a club, and he was attacked by several men while stopped at some train tracks. He stated he was hit with a baseball bat numerous times. He then proceeded home and decided the best thing to do was to leave

town, so he began walking to his grandmother's house. The same men came by again, grabbed him, and put him in the car. After driving for about fifty minutes, the men threw him out of the car, told him if he knew what was best, he would not come back to Arkansas, and threw onto the ground $200 and a bus ticket to Cleveland. Appellant went to Cleveland and stayed with a female friend and his sister for a couple of months, until the Cleveland police came to his sister's house and detained him. Appellant testified that he waived extradition back to Arkansas and voluntarily gave the statement to the police that had been played for the court earlier.

On cross-examination, appellant confirmed that Kelly had asked him numerous times about the hit on Lambert and admitted that he had never warned her of any possible danger. Appellant stated that he did not warn her because he "didn't want to get involved." Appellant stated that he had not brought Kelly to Lambert's house; Kelly had come in the house himself. Appellant also stated that, at the time, it was not on his mind that Kelly had approached him at least three times about killing Lambert. Appellant also stated that he had made a statement to the police in Cleveland, in which he told them about the threat to his son, but he did not know where that statement was now.

At the close of the defense's case, appellant renewed his motion to dismiss, which was again denied. In denying the motion, the court stated:

> [I]t's my understanding the law is that the accomplice in this case being Kenneth Lawshea, he's not the one that has to have the premeditated and deliberate purpose to cause the death, that the codefendant or the accomplice in this case who was Clarence Kelly, had that reckless of purpose. Then, if in fact Mr.

> Lawshea is an accomplice and if the other elements are met, ... then he's equally responsible for the murder or the homicide of Ms. Lambert.

After taking a recess to deliberate, the court then announced its decision. After reviewing the relevant law and the evidence presented, the court found that the evidence was consistent with appellant's guilt as an accomplice or as a principal. The court specifically found that appellant's testimony was self-serving, that much of his testimony on direct examination was discredited or impeached on cross-examination, and that his testimony and explanations were "implausible and not believable." The court found beyond a reasonable doubt that appellant was guilty of capital murder as an accomplice with Clarence Kelly in the murder of Shirley Lambert and sentenced appellant to life in prison without parole. This timely appeal followed.

On appeal, appellant challenges the sufficiency of the evidence supporting his conviction, arguing that the State failed to prove he acted with premeditation and deliberation. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Boyd v. State*, 369 Ark. 259, 253 S.W.3d 456 (2007). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.* On appeal, this court does not weigh the evidence presented at trial, as that is a matter for the fact-finder; nor does the appellate court assess the credibility of the witnesses. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). The fact-finder is free to believe all or part of a witness's testimony and may resolve all questions of

conflicting testimony and inconsistent evidence. *Rounsaville v. State*, 374 Ark. 356, 288 S.W.3d 213 (2008).

Arkansas Code Annotated section 5–10–101(a)(4) (Supp.2009) provides that a person commits capital murder if, "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." In this case, appellant's criminal liability is based upon his status as an accomplice. Under accomplice liability, a person may commit an offense by his own conduct or by that of another person. Ark.Code Ann. § 5–2–401 (Repl.2006). A person is criminally liable for the conduct of another person when he is the accomplice of another person in the commission of an offense. Ark.Code Ann. § 5–2–402(2) (Repl.2006). A person is an accomplice when he or she solicits, advises, encourages, coerces, aids, agrees to aid, or attempts to aid in the commission of an offense. Ark.Code Ann. § 5–2–403(b)(1)–(2) (Repl.2006).

We have said that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Jefferson v. State*, 359 Ark. 454, 198 S.W.3d 527 (2004). When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). One cannot disclaim accomplice liability simply because he did not personally take part in every act that went to make up the crime as a whole. *Id.* However, when causing a particular result is an element of an offense charged under accomplice liability, the accomplice must act with the culpability required for the commission of the offense. Ark.Code Ann. § 5–2–403(b). Causing the death of a person, as in murder or manslaughter, is a particular result. *See Fight v. State*, 314 Ark. 438, 863 S.W.2d 800 (1993).

On appeal, appellant asserts that the State did not present substantial evidence that he acted with premeditation or deliberation, either alone or as an accomplice. Appellant contends that the strongest evidence presented against him was the testimony of Bobby Trump and Steve Caudle, who both implicated appellant as an accomplice. However, appellant argues, it cannot be inferred from the testimony presented at trial that he acted with premeditation and deliberation or that he encouraged, aided, or assisted anyone in committing any crime against the victim. There was "no sufficient physical evidence that would give rise to a level of suspicion" against him, nor was there any direct or circumstantial evidence to indicate that he had any intent to cause harm to the victim. According to appellant, to assume that he encouraged Kelly to behave as he did amounts to nothing more than speculation and conjecture; therefore, the State's evidence was insufficient, and his conviction should be reversed.

However, as stated previously, appellant's criminal liability in this case is based on his status as an accomplice, and appellant failed to challenge his status as an accomplice at the trial court level. Appellant's directed verdict motion below argued insufficient evidence of the requisite mens rea for capital murder, namely premeditation and deliberation, and our case law is wellsettled that a party cannot change the grounds for an objection on appeal, but is bound by the scope and nature of the arguments presented at trial. *Eubanks v. State*, 2009 Ark. 170, 303 S.W.3d 450 (2009). So any argument on appeal that there was insufficient evidence of his acting as an accomplice, by encouraging, aiding, or assisting Kelly in the murder, is not preserved for this court's review.

As to the evidence of premeditation and deliberation, which the State was required

to prove pursuant to Ark.Code Ann. § 5–2–403(b), the evidence presented at trial showed that appellant was aware that several individuals desired that Shirley Lambert be killed; that Kelly approached appellant on at least three occasions about joining him in committing this killing; that despite his close relationship with the victim, appellant never warned her of any danger; that on the day of the murder, Kelly announced to appellant they were going to "make this money"; that appellant rode with Kelly and two other individuals to the victim's home; that appellant gained entry to the victim's home; and that appellant was present in the bedroom where the victim's body was found. In addition, appellant fled to Cleveland, Ohio, after the crime, and this court has held that flight from the place where a crime has been committed may be considered evidence of guilt. *Branscum v. State,* 345 Ark. 21, 43 S.W.3d 148 (2001). And, while appellant explained in his own testimony that his presence at the crime scene was only to retrieve "tools" to do drugs, and he did not know the murder was going to occur, the circuit court found appellant's testimony to be self-serving and not credible. As stated previously, this court does not assess the credibility of the witnesses, as this is within the province of the factfinder. *Ridling, supra.* Accordingly, we find there was substantial evidence to find that appellant was guilty as an accomplice in the death of Shirley Lambert, and we therefore affirm appellant's conviction for capital murder. The record in this case has been reviewed for reversible error pursuant to Arkansas Supreme Court Rule 4–3(i), and none has been found.

Affirmed.

IMBER, J., not participating.