2011 Ark. 371

**Lemuel Session WHITESIDE, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 10–1200.**

Supreme Court of Arkansas.

Sept. 22, 2011.

J. Thomas Sullivan and Mark F. Hampton, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Vada Berger, Ass't Att'y Gen., for appellee.

Jessica R. Feierman, Juvenile Law Center, for amicus curiae Juvenile Law Center.

Cheryl V. Barnard, Arkansas Public Defender Commission, for amicus curiae Arkansas Public Defender Commission.

Mark F. Hampton, J. Thomas Sullivan and Cheryl V. Barnard, Little Rock, AR, Jessica R. Feierman, Philadelphia, PA, for appellant.

ROBERT L. BROWN, Justice.

Appellant Lemuel Session Whiteside,[1] a juvenile who was seventeen at the time the offense was committed, was convicted of capital-felony murder and aggravated robbery in connection with the robbery and death of James London. He was sentenced to life in prison without parole for the capital-murder conviction and thirty-five years in prison for the aggravated robbery. He was also given a fifteen-year sentencing enhancement for employing a firearm in connection with the aggravated robbery. He appeals the judgment against him on five grounds.

The following pertinent testimony surrounding these offenses was presented at Whiteside's trial. Cynthia Arrington testified that on January 28, 2009, Whiteside and Cambrin Barnes picked her up from school and took her to Barnes's house, where she intended to meet her boyfriend and Barnes's cousin, Reginald James. Arrington testified that upon arriving at Barnes's house, Whiteside received a telephone call from his mother. During this telephone conversation, she stated, Whiteside asked his mother if she wanted him to come over and rob someone. After this conversation ended, Whiteside called his girlfriend, Leanna Talley, at her job and told her that there was a man at his mother's house with $8,000 and that she needed to pick him up and take him over there because he was going to "hit a lick," which was a slang term for a robbery.

Talley testified that she left work after that telephone call, picked Whiteside up at Barnes's house, and took him to his mother's house. She stated that Whiteside went inside the house for about five minutes, while Talley waited in the car. When he came out, Whiteside told Talley to drive back to Barnes's house. She testified that she drove him back to Barnes's house where they picked up Barnes and Arrington. She added that Whiteside then told her to return to his mother's house. Arrington testified that during this ride over to Whiteside's mother's house, she saw Whiteside with a gun.

According to Talley, Whiteside and Barnes went inside his mother's house but came out after about five minutes and told her to drive off. She said that Whiteside said to her "that man was real scared" and that "[i]f my mom hadn't stopped me, you know, then we would have robbed him." Arrington confirmed Talley's version of events and also testified that Whiteside directed Talley to turn around and go back to the house because "that person [London] is scared and he is about to empty his pockets." Arrington added that Whiteside told Barnes that they were going to catch the man coming out of the house and were going to take his money. As they were

---

1. Appellant's middle name is spelled two ways, "Session" and "Sission," in court documents. We have used the "Session" spelling as that is what appears on his judgment and commitment order.

headed back to the house the second time, she stated that she saw Whiteside pass the .40–caliber handgun to Barnes in the backseat. She next testified that Whiteside directed Barnes to stand outside in front of the bushes while he went inside to get the man to come out. Arrington claimed that she saw Barnes with the gun as Whiteside and Barnes got out of the car the second time.

Talley further maintained that Whiteside entered the house and that Barnes stayed outside in front of the bushes. She testified that a few minutes later London left the house, followed by Whiteside. Arrington stated that she saw Whiteside push London up against an outside wall and grab his shirt, while Barnes was pointing the gun at London. She overheard London beg for his life and offer to give the boys everything he had. Arrington next testified that she saw London break away from Whiteside, rush toward Barnes, and Barnes shoot him.

Arrington testified that after London was shot, she saw him run and then collapse in a neighbor's front yard. According to Arrington, both Barnes and Whiteside ran back to the car but only Barnes got in. She testified that Barnes told Talley to "go, go, go" and that Whiteside was going back to get the money from London. According to Talley, Barnes did not have any money on him when he got back into the car. Stan Wilhite, a member of the crime scene investigation unit of the Little Rock Police Department, testified that a .40 caliber shell casing, but no cash, was collected from the crime scene.

In a felony information filed on March 27, 2009, Whiteside was charged with capital-felony murder and aggravated robbery in the robbery and death of James London.[2] During the ensuing trial, Whiteside moved for a directed verdict and argued that the State's evidence failed to demonstrate that Whiteside caused London's death in the course of committing aggravated robbery. The motion was denied by the trial court. The jury subsequently returned a verdict of guilty for capital-felony murder and aggravated robbery, and Whiteside was sentenced as already referenced in this opinion.

I. *Sufficiency of the Evidence*

■ Whiteside's first point on appeal is a challenge to the sufficiency of the evidence supporting his capital-felony murder conviction. He asserts that there was no evidence introduced by the State to show that he aided, solicited, induced, or commanded the commission of the murder. He further argues that his action in giving the gun to Barnes, an act he concedes in his brief, undoubtedly facilitated the commission of the aggravated robbery but in no way facilitated Barnes's act of shooting London, which he describes as "reflexive." He also advances the argument that his conviction for capital-felony murder must not stand because the evidence fails to show that he had "any greater intent than to assist in the commission of the underlying felony."

■ A challenge to the sufficiency of the evidence is an assertion that the verdict was not supported by substantial evidence. *Sales v. State,* 374 Ark. 222, 289 S.W.3d 423 (2008). This court has held that substantial evidence is evidence that is forceful evidence enough to compel a conclusion one way or the other beyond speculation or conjecture. *Flowers v. State,* 373 Ark. 127, 282 S.W.3d 767 (2008). On review, the appellate court views the evidence in the light most favorable to the

---

2. Barnes was also charged with capital-felony murder and aggravated robbery. He accepted a negotiated plea of a lesser charge and did not testify at Whiteside's trial.

verdict and considers only evidence that supports the verdict. *Id.*

The capital-murder statute in the Arkansas Criminal Code provides in pertinent part that:

(a) A person commits capital murder if:

(1) Acting alone or with one (1) or more persons:

(A) The person commits or attempts to commit ... aggravated robbery ... and

(B) In the course and furtherance of the felony or the immediate flight from the felony, the person or an accomplice causes the death of a person under circumstances manifesting extreme indifference to the value of human life.

. . . .

(b) It is an affirmative defense to any prosecution under subdivision (a)(1) of this section for an offense in which the defendant was not the only participant that the defendant did not commit the homicidal act or in any way solicit, command, induce, procure, counsel, or aid in the homicidal act's commission.

Ark.Code Ann. § 5–10–101 (Repl.2009).

A person commits robbery under the Arkansas Criminal Code if "with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person." Ark.Code Ann. § 5–12–102 (Repl.2006). For aggravated robbery, a person must be: (1) armed with a deadly weapon; (2) represent by word or conduct that he is armed with a deadly weapon; or (3) inflict or attempt to inflict death or serious physical injury upon another person. Ark.Code Ann. § 5–12–103 (Repl.2006).

An accomplice to the commission of an offense under the Arkansas Criminal Code is one who, with the purpose of promoting or facilitating the offense:

(1) Solicits, advises, encourages, or coerces the other person to commit the offense;

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense; or

(3) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to prevent the commission of the offense.

Ark.Code Ann. § 5–2–403(a) (Repl.2006); *see also Arnett v. State,* 342 Ark. 66, 27 S.W.3d 721 (2000).

■ This court has held that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Lawshea v. State,* 2009 Ark. 600, 357 S.W.3d 901. We have further held that when two people assist one another in the commission of a crime, each is an accomplice and is criminally liable for the conduct of both. *Id.* One cannot disclaim accomplice liability simply because he or she did not personally take part in every act that combined to make up the crime as a whole. *Id.* This court, in addition, has held that in order to sustain a conviction for capital-felony murder, it is not necessary that the defendant be shown to have taken an active part in the killing itself so long as he was an accomplice to, and had the requisite intent for, the underlying felony. *See Miles v. State,* 350 Ark. 243, 248–49, 85 S.W.3d 907, 911 (2002); *see also Arnett,* 342 Ark. at 72, 27 S.W.3d at 724.

■ Whiteside admits his status as an accomplice to the aggravated robbery that culminated in the murder of London. He asserts, nevertheless, that he was not an accomplice to the homicidal act because he did not in any way solicit, command, induce, procure, counsel, or aid in the com-

mission. When considering accomplice liability in the felony-murder context, all that is required is proof of the accomplice's participation in, and intent to commit, the underlying felony. *See Miles v. State, supra.* As recognized by this court in *Miles,* Whiteside's concession that he participated in the aggravated robbery presents this court with adequate grounds to affirm Whiteside's conviction for capital-felony murder.

Because it is patently clear that London was killed in furtherance of the aggravated robbery that was planned and executed by Whiteside, the evidence is more than sufficient to convict Whiteside of capital-felony murder. We affirm the trial court's denial of Whiteside's motion for directed verdict.

## II. *Shifting Burden of Proof*

■ For his second point, Whiteside claims that the felony-murder statute improperly shifts the burden of proof to him by requiring him to disprove his guilt by raising the affirmative defense set out at section 5–10–101(b), all of which violates his right to due process. He maintains that his trial counsel objected to the trial court's use of the model jury instruction addressing the affirmative defense and that this objection included a reference to this court's decisions in *Jefferson v. State,* 372 Ark. 307, 276 S.W.3d 214 (2008), and *Jones v. State,* 336 Ark. 191, 984 S.W.2d 432 (1999). In those decisions, this court rejected arguments that the statutory affirmative defense impermissibly shifts the burden of proof to the accused in a capital-felony-murder prosecution. On appeal, he now asserts that those decisions were wrongly decided and urges this court to reconsider its holdings on this issue at this time.

In response, the State argues that this argument is not preserved for appellate review. The State contends that the objection raised by Whiteside's defense counsel related only to the argument that the model jury instruction did not properly track the language of either the statute or the case law. Thus, the State argues that defense counsel's citation to *Jefferson v. State, supra,* and *Jones v. State, supra,* were used in support of his argument that the language of the instruction was wrong and not that the statute or instruction improperly shifted the burden of proof to the accused.

■ The State is correct. We agree that the burden-shifting argument was not raised or developed before the trial court. This court has consistently held that where an appellant fails to raise an argument in the trial court, it is not preserved for our review. *See, e.g., Davis v. State,* 2009 Ark. 478, 348 S.W.3d 553. In addition, our law is well settled that issues raised for the first time on appeal, even constitutional ones, will not be considered on appeal. *Id.* For this reason, we refrain from addressing Whiteside's burden-shifting argument.

## III. *Cruel and Unusual Punishment*

■ For his third point, Whiteside urges that his sentence of life without the possibility of parole is unusual, excessive, and in violation of his rights under the Eighth Amendment of the United States Constitution and article 2, section 9 of the Arkansas Constitution because he was a juvenile at the time of the offense. In support of his argument, he directs this court to *Graham v. Florida,* —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), where the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits the imposition of a life-without-parole sentence on a juvenile offender in nonhomicide cases. He asserts that the *Graham* holding should be extended to juvenile offenders who are convicted as accomplices in

capital-felony murders. In support of this argument, Whiteside points this court to the analysis in *Graham* where the Court said that compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability because of the offender's age and the nature of the nonhomicide offense. *Graham*, 130 S.Ct. at 2027. He maintains that this analysis should apply in the instant case and that his conviction for felony murder should be treated essentially as a nonhomicide conviction due to his lack of culpability in the murder. He recognizes that this court recently declined to extend *Graham* in *Jackson v. Norris*, 2011 Ark. 49, 378 S.W.3d 103, a case decided in February of this year involving a juvenile convicted of capital-felony murder and sentenced to life imprisonment without parole. Despite this, he argues that this court should reconsider the *Graham* argument in light of the fact that in *Jackson*, the appellant raised his claim in connection with his habeas corpus petition as opposed to a direct appeal, as is the posture of the instant appeal.

■ Whiteside is correct that *Graham* held that the Eighth Amendment prohibits the imposition of the sentence of life without parole on a juvenile who committed a nonhomicidal offense. Whiteside, though, was convicted of a homicide—capital-felony murder. While he was an accomplice to the homicide, neither our statutory law nor case law draws a distinction between the liability of a principal and that of an accomplice who participates in a felony murder. *See* Ark.Code Ann. § 5–2–402(2)(Repl.2006); *Lawshea*, 2009 Ark. 600, 357 S.W.3d 901. Further, to reiterate the principles of accomplice liability in the context of felony murder, this court has repeatedly held that it is not necessary that the defendant be shown to have taken an active part in the killing as long

as he was an accomplice to, and had the requisite intent to commit, the underlying felony. *See, e.g., Miles*, 350 Ark. at 248–49, 85 S.W.3d at 911; *see also Arnett*, 342 Ark. at 72, 27 S.W.3d at 724. Finally, as recognized by the State as well as Whiteside, this court has already considered the *Graham* argument and rejected it, not only in *Jackson* but in *Cox v. State*, 2011 Ark. 96, 2011 WL 737307 (per curiam) as well.

We turn then to Whiteside's claim that the imposition of the life-without-parole sentence on a juvenile offender such as himself violates article 2, section 9 of the Arkansas Constitution, which protects against cruel or unusual punishment. His only argument in support of this contention is that article 2, section 9 affords juveniles greater protection than the Eighth Amendment because under Arkansas law, a juvenile has a statutory right to challenge his prosecution as an adult and request a transfer to the juvenile division. He argues that this reflects Arkansas's policy concern for protecting juveniles amenable to treatment or training in the juvenile-justice system.

Whiteside fails, however, to recognize that this court in *Jackson* also rejected the argument that the imposition of a life-without-parole sentence for a juvenile capital-felony-murder offender violates article 2, section 9 of the Arkansas Constitution. Because this issue has already been addressed and decided by this court and because Whiteside has neither requested nor offered any convincing argument why this court should overturn prior precedent on this point, Whiteside's state constitutional argument must fail.

IV. *Mandatory Life Sentence*

For his fourth point, Whiteside contends that the imposition of the mandatory life-without-parole sentence is void and illegal

in that it violated his right to a jury trial under article 2, section 10 of the Arkansas Constitution and Arkansas Code Annotated section 5–4–103. He maintains that this also resulted in a violation of his right to due process, as protected by the Fourteenth Amendment to the United States Constitution.

■ At the outset, we note that Whiteside concedes that this specific argument was not made at the trial-court level. Nevertheless, because this issue concerns a void or illegal sentence, which this court has held is an issue akin to subject-matter jurisdiction, it cannot be waived by a party. *See Mayes v. State,* 351 Ark. 26, 89 S.W.3d 926 (2002). Hence, it may be raised for the first time on appeal. *Id.*

■ Whiteside raises several points in support of his argument that his sentence is void and illegal. First, he asserts that there is an irreconcilable conflict between Arkansas Code Annotated sections 5–4–103 and 16–97–101(3), which address the jury's authority to fix punishment, and sections 5–4–104 and 5–4–602(3)(b)(ii), which set the punishment for capital murder as death or life imprisonment without parole. Under the latter two statutes, if the death penalty is not available for whatever reason, the trial court must sentence the defendant to life without parole. He claims that this conflict between statutory provisions must be resolved in favor of permitting discretionary sentencing by the jury, because the jury-sentencing statutes control and implicitly repeal statutes to the contrary.

■ ⌊₁₂The law on this point is well settled. Statutes relating to the same subject should be read in a harmonious manner if possible. *Thomas v. State,* 349 Ark. 447, 79 S.W.3d 347 (2002). All legislative acts relating to the same subject are said to be *in pari materia* and must be con-

strued together and made to stand if they are capable of being reconciled. *Id.* In addition, repeals by implication are strongly disfavored by the law, and a statute will only be impliedly repealed in Arkansas when two enactments cannot stand together. *Cox v. State,* 365 Ark. 358, 229 S.W.3d 883 (2006). Repeal by implication is only recognized in two situations: (1) where the statutes are in irreconcilable conflict, and (2) where the legislature takes up the whole subject anew, covering the entire subject matter of the earlier statute and adding provisions clearly showing that it was intended as a substitute for the former provision. *Thomas v, State, supra.* Finally, this court will not recognize a repeal by implication if there is a way to interpret the statutes harmoniously. *Cox v. State, supra.*

As emphasized by the State, Whiteside's argument regarding jury sentencing ignores the additional language of section 5–4–103(a), which reads that the jury is to fix punishment "as authorized by this chapter," meaning Chapter 4 of Title 5. *See* Ark.Code Ann. § 5–4–103(a)(Repl.2006); *see also Ricks v. State,* 327 Ark. 513, 940 S.W.2d 422 (1997) (finding no conflict between section 5–4–103(a) and section 5–4–501, which requires a mandatory sentence of life imprisonment without parole). Further, this court considered a similar argument in *Bunch v. State,* 344 Ark. 730, 43 S.W.3d 132 (2001), and rejected it, holding that a statute prescribing a mandatory life sentence does not impermissibly conflict with the jury's right to fix punishment. *See Bunch,* 344 Ark. at 737, 43 S.W.3d at 137. Finally, this court ⌊₁₃has previously held that the legislative acts establishing section 16–97–101 did not take up the whole subject of sentencing but "merely altered the timing and procedure for sentencing in felony jury trials" and "did not broaden the jury's sentencing authority or reduce the trial court's sentencing authori-

ty." *Thomas,* 349 Ark. at 457, 79 S.W.3d at 352–53 (rejecting the claim that section 16–97–107(e), permitting the trial court to reduce the punishment imposed by a jury, irreconcilably conflicted with and implicitly repealed sections 5–4–103 and 16–97–101). We hold that these statutory provisions may be read harmoniously, and, thus, there is no conflict. *See Thomas v. State, supra; Bunch v. State, supra; Ricks v. State, supra.*

■■■■■ Whiteside next argues that the imposition of a mandatory sentence by the trial court violates his right to a jury trial under the Arkansas Constitution. The Arkansas Constitution, however, guarantees only the right to a jury trial and not the right to be sentenced by a jury. *See* Ark. Const. Art. 2, § 10; *see also Ricks,* 327 Ark. at 517, 940 S.W.2d at 424. Furthermore, Whiteside cites no legal authority for his proposition that the right to a jury trial, as conferred by the Arkansas Constitution in criminal cases, also implicates the right to jury sentencing. Mere conclusions unsupported by convincing argument or legal authority will not be accepted or reviewed by this court. *See, e.g., Ware v. State,* 348 Ark. 181, 75 S.W.3d 165 (2002).

■■■■■ Whiteside makes a final argument, citing *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), that the violation of his right to jury sentencing under Arkansas law also violates his due-process rights guaranteed by the Fourteenth Amendment to the United States Constitution. *Hicks,* however, is inapposite to Whiteside's case. In *Hicks,* the Supreme Court held that the Oklahoma Court of Criminal Appeals's affirmance of Hicks's mandatory forty-year sentence that was imposed pursuant to a statute that had since been held unconstitutional, violated his right to due process under the Fourteenth Amendment because the state court assumed that a jury also would have sentenced Hicks to forty years, the maximum sentence permitted under the statutory sentencing range. *Hicks,* 447 U.S. at 345, 100 S.Ct. 2227. In support of this conclusion, the Court found that "Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision." *Id.* at 346, 100 S.Ct. 2227. The Court concluded that this was an "arbitrary disregard of the petitioner's right to liberty" which resulted in a denial of due process. *Id. Hicks* is clearly factually distinguishable from the instant case, and, as noted by the State, there is nothing in the Court's decision that indicates a defendant's due-process rights are violated by the imposition of a mandatory fixed sentence, as provided by state statute.[3]

We affirm the judgment on all grounds. The record in this case has been reviewed for prejudicial error in accordance with Arkansas Supreme Court Rule 4–3(i) (2011), and none has been found.

Affirmed.

---

3. In his opening brief, Whiteside also briefly raises a fifth point on appeal concerning the validity of his sentencing enhancement. In his reply brief, however, he concedes that this point has been decided adversely against him in two recent cases and offers no argument as to why these cases should be overturned. *See Sesley v. State,* 2011 Ark. 104, 380 S.W.3d 390; *Hervey v. State,* 2011 Ark. 113, 2011 WL 913203.